**DERBY & CO., INC., Plaintiff,**

v.

**SEAVIEW PETROLEUM COMPANY, Defendant.**

Civ. A. No. 82–2964.

United States District Court, E.D. Pennsylvania.

Feb. 19, 1991.

Robert J. Lynch, New York City, Thomas P. Preston, Philadelphia, Pa., Jerome E. Sharfman, Newark, N.J., for plaintiff.

William A. Jacobson, Charles R. Jacob, III, New York City, John P. Mason, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Defendant Seaview Petroleum Company moves for summary judgment on the ground that there is no evidence to support plaintiff's claims for negligence, breach of contract, and unjust enrichment. In the alternative, in a supplemental motion for summary judgment, Seaview avers that Derby's complaint is barred by New Jersey's Entire Controversy Doctrine. There is no merit in either motion and both will be denied.

### I. *Facts*

In early January, 1981, Derby contracted to sell Seaview a quantity of Libyan Amna crude oil. To meet its obligations to Seaview, Derby entered into a contract with Cities Service Company for a barrel-for-

barrel exchange of Nigerian Forcados crude oil for Libyan Amna crude oil. Cities was to deliver the oil directly to Seaview. Cities was to pay Derby for the difference in market value between the quantity of Nigerian Forcados crude oil it received and the quantity of Libyan Amna crude oil it delivered to Seaview on Derby's behalf. There was no contractual relationship, however, between Cities and Seaview. Section two of the Derby–Seaview contract provided that an independent inspection company, retained jointly by the parties, would perform the appropriate measurements and calculations to determine the quality and quantity of crude oil ultimately delivered to Seaview. The parties agreed that "[t]he independent inspector's determination as to quantity and quality shall be conclusive and binding upon both parties," Derby–Seaview agreement of sale at 2.1; however, the inspector's testing methods were required to be in accordance with standard test methods generally accepted in the petroleum industry. The contract between Derby and Cities contained almost identical language with respect to the conclusiveness of the inspector's test results. The American Society for Testing and Materials (ASTM) and the American Petroleum Institute (API) have published official standards for this purpose.

At Seaview's insistence, the parties retained E.W. Saybolt & Co. to conduct the independent inspection. Cities also agreed in its contract with Derby to be bound by Saybolt's calculations, but nonetheless hired its own inspection company, Caleb Brett & Son, Ltd., to attend the discharge of the oil cargo at Seaview's terminal and to conduct a simultaneous inspection. In both the Derby–Cities Service contract and the Derby–Seaview contract the parties agreed they would be governed by New York law.

The Hellespont Pride loaded the cargo of Amna crude oil, which is the focus of the parties' dispute, at Ras Lanuf, Libya, on February 1, 1981. The ship berthed at the terminal in New Jersey twenty-six days later and began discharge to Seaview's shore tanks. Upon its arrival, Saybolt and Caleb Brett boarded the vessel to commence inspection and sampling of the cargo. The inspectors separately measured free water content and sediment and water ("S & W") content on the ship's tanks.[1] Saybolt deducted these measurements from the overall volume of the cargo and reported to the parties that 408,088.79 barrels of crude oil had been delivered to Seaview. Once the discharge had been completed, Saybolt and Caleb Brett examined the shore tanks and once again gauged the free water content. They both found an increase of 3,879.8 barrels of free water above the quantity measured on the Hellespont Pride. Saybolt adjusted its overall figure accordingly. Following laboratory analysis of the samples of crude oil removed from the ship, Saybolt revised upward its S & W percentages, and thereby reduced its calculation of the net quantity of crude oil Seaview received. Saybolt adjusted its survey report and certified that 401,151.28—not 408,088.79—barrels of crude oil had been received. Seaview paid Derby based on the adjusted figure as per the Derby–Seaview contract. Cities paid Derby based on the adjusted figure as per the Derby–Cities contract.

Soon thereafter, Caleb Brett advised Cities that according to its calculations and laboratory analysis, Seaview received 410,625.35 barrels of crude oil—9,474.07 more barrels than Saybolt had reported. Caleb Brett arrived at a higher net quantity of

---

1. Cargos of crude oil typically contain a quantity of water which is deducted from the overall volume of the cargo to arrive at a net quantity of crude oil delivered. The water in cargoes of crude oil exists either as "free water" (water which has precipitated out of the crude oil and is identifiable as water separate from the oil), or as "sediment and water" ("S & W") (emulsified water which is dispersed as a colloidal suspension within the oil). *Cities Service Co., Inc. v.* *Derby & Co., Inc.,* 654 F.Supp. 492, 495 (S.D.N.Y. 1987). To determine the quantity of S & W in the oil, the independent inspector removes a representative sample of the cargo and subjects it to laboratory analysis. From the sample, the inspector calculates the percentage of water in suspension, and deducts this amount, together with the free water, from the total volume of liquid cargo delivered to determine the net quantity of crude oil received. *Id.*

crude oil because its S & W and free water calculations were significantly lower than Saybolt's. Cities informed Derby of the discrepancy between the two inspector's findings. Derby billed Seaview for an additional 9,474.07 barrels of crude oil. When Seaview refused to pay the additional amount, Derby informed Cities that it would not refund any of the money Cities had paid to it.

Cities sued Derby in the Southern District of New York to recover what it claimed was an overpayment. Cities sought a judicial determination that Saybolt's testing methods deviated from accepted ASTM/API standards, that such deviation was tantamount to the fraud, bad faith, or gross error necessary under New York law to overturn a certification which the parties had previously agreed would be "conclusive and binding." Cities also alleged that Seaview improperly injected a deemulsifier into the cargo lines, causing water to precipitate out of the oil during discharge, and also causing water to be released from sediment in the shore tanks, thereby artificially inflating Saybolt's free water calculation. According to Cities, the use of a deemulsifier before discharge was contrary to accepted industry practice. Cities alleged that Saybolt knew that Seaview had injected a deemulsifier into the cargo, but nonetheless failed to account for this when calculating free water content.

In the New York action, Derby denied that Saybolt's methods were inconsistent with industry standards; however, in the event the court found otherwise, Derby sought to bring Seaview into the action as a third party defendant. Finding that it lacked jurisdiction over Seaview, the New York court granted Seaview's motion to dismiss Derby's third-party complaint against it. Derby then filed an action in this court against Seaview which I stayed pending the outcome of the New York case.

Several years later, while the New York action was still pending, Cities sued Saybolt in New Jersey Superior court. In a separate New Jersey state court action, Derby sued Saybolt, which then filed a third-party complaint against Seaview. The Derby–Saybolt–Seaview action was consolidated with the Cities–Saybolt action in New Jersey Superior Court.

Judge Kram of the Southern District of New York issued extensive findings of fact and conclusions of law following a bench trial in Cities' lawsuit against Derby. Concluding that Saybolt's inspection and testing methods failed to comply with ASTM/API standards as required by the Cities–Derby contract, Judge Kram set aside Saybolt's certification and held that Cities was not bound by them. *Cities Service Co. v. Derby & Co., Inc.*, 654 F.Supp. 492, 502 (S.D.N.Y.1987). The court further concluded that Caleb Brett's calculations were appropriate because the method Caleb Brett employed conformed with industry standards and with the language of the Derby–Cities contract. Judge Kram substituted Caleb Brett's certification of the net quantity of crude oil received by Seaview, and awarded damages to Cities for the value of the discrepancy. Judge Kram's decision was later affirmed by the second Circuit. *Cities Service Co. v. Derby & Co., Inc.*, 835 F.2d 1429 (2d Cir.1987).

Following Judge Kram's verdict and the Second Circuit's affirmance, Cities voluntarily withdrew from the consolidated New Jersey action. At Seaview's request, the stay in this lawsuit was continued pending the outcome of the New Jersey case. Immediately before the stay was issued, however, Seaview filed the within motion for summary judgment based primarily on Derby's contentions in the New York action. Derby and Saybolt eventually reached a settlement in the New Jersey action in which Seaview did not participate. The New Jersey action was dismissed, and I lifted the stay in this case. Seaview then filed a supplemental motion for summary judgment which it requested that I consider first, alleging that Derby's complaint pending before me is barred by the New Jersey Entire Controversy Doctrine.

## II. *Seaview's Supplemental Motion for Summary Judgment—The Entire Controversy Doctrine*

■ Seaview seeks dismissal of Derby's lawsuit under the New Jersey Entire Con-

troversy Doctrine ("ECD"), a state common law principle codified at New Jersey Civil Practice Rules 4:27–1 (mandatory joinder of claims) and 4:28–1 (mandatory joinder of parties). The ECD is an equitable doctrine designed to avoid the delay and expense of multiple litigation and "claim-splitting." The doctrine requires that a party "who has elected to hold back from the first proceeding a related component of the controversy be barred from thereafter raising it in a subsequent proceeding." *Ajamian v. Schlanger,* 14 N.J. 483, 103 A.2d 9, 10, *cert. denied,* 348 U.S. 835, 75 S.Ct. 58, 99 L.Ed. 659 (1954). The ECD bars subsequent causes of action arising out of the same set of facts or events against parties to the original action, *Tall Timbers Property Owners Assoc. v. Tall Timbers, Inc.,* 217 N.J.Super 119, 524 A.2d 1315, 1317 (App.Div.1987), as well as non-parties, *Cogdeil v. Hospital Center at Orange,* 116 N.J. 7, 560 A.2d 1169 (1989). The ECD therefore reaches more broadly than *res judicata* or collateral estoppel because it precludes subsequent litigation of related claims, regardless of whether they were raised or resolved in the previous action, and even if they are capable of independent adjudication. *Printing Mart–Morristown Inc. v. Rosenthal,* 650 F.Supp. 1444, 1447 (D.N.J.1987).

■ The short answer to this contention is that if the ECD be considered substantive in nature, it has no application to this case because the parties agree that New York law is applicable. On the other hand, if ECD be considered procedural, it has no application here because it is a New Jersey state law, hardly controlling in federal actions in Pennsylvania. The longer answer to Seaview's contention is that a New Jersey state court would not bar Derby's action against Seaview because this lawsuit, though arising out of the same set of operative facts as the New Jersey action, is not a "subsequent proceeding."

This action was filed in 1982, five years *before* Derby filed suit against Saybolt in New Jersey. At Seaview's request and in spite of Derby's opposition, I granted a temporary stay of this action in 1983 pending the outcome of the New York case. When Saybolt filed a third party action against Seaview in New Jersey, Seaview sought to continue the stay. Again, Derby opposed any further delay in the adjudication of its claims against Seaview. At a status conference in this case in April of 1988, Derby offered, in lieu of a stay, to transfer its cause of action against Seaview to New Jersey, where its claims against Saybolt and Saybolt's claims against Seaview were pending. Seaview declined. Although I initially denied a continuation of the stay, in October of 1988, I authorized Judge Kelly, who was acting as emergency judge, to sign an order continuing the stay since it appeared that Derby and Saybolt were close to settlement in New Jersey.[2] The stay continued until February of 1989, when counsel for Seaview wrote to inform me that it intended to file the within supplemental motion for summary judgment under the New Jersey ECD.

Having successfully orchestrated two stays of this litigation for over six years and after declining Derby's invitation to discontinue this action in exchange for unopposed consolidated litigation in New Jersey, Seaview now seeks the "protection" of an equitable remedy which is intended to avoid the very conduct in which it has engaged. In each of its requests for a stay of this action, Seaview represented to me that the litigation pending in distant forums could resolve the issues before me. In the interest of "judicial economy," Seaview urged me to suspend disposition of Derby's claims. Seaview never mentioned its intent to invoke the ECD to *bar* disposition of Derby's claims on their merits until it sought to lift the stay. Had Seaview done so, I would hardly have complied with its requests to delay this litigation.

I am not aware of any case in which the ECD has been applied to dismiss a lawsuit where a subsequently-filed, albeit related,

---

2. The parties neglected to inform me at the time whether Seaview had participated in settlement discussions in New Jersey, or whether Derby had been made "whole" by its settlement with Saybolt, thereby precluding further recovery in this court.

lawsuit is resolved first. Although principles of *res judicata* and collateral estoppel may mandate dismissal of prior claims once they are resolved in subsequent related actions, that is not the situation here. Derby has not yet had its day in court with respect to its cause of action against Seaview. Seaview maintains that it is the timing of the adjudication or resolution of the dispute which governs application of the ECD, not the filing of the lawsuit. Thus, by avoiding adjudication of a prior lawsuit through successive petitions for a stay, according to Seaview, a defendant can later seek to dismiss that lawsuit under the ECD. As might be expected, the legal authority Seaview cites supports the contrary proposition. *See Printing Mart–Morristown, Inc. v. Rosenthal,* 650 F.Supp. 1444 (D.N.J.1987) (court dismisses RICO claims in subsequent federal action where plaintiff failed to assert them in prior state court proceeding); *Jones v. Warren,* 199 N.J.Super 2, 488 A.2d 220 (App.Div.1985) (barring second litigation); *Silverstein v. ABCO Vending Service, Inc.,* 37 N.J.Super 439, 117 A.2d 527 (App.Div.1955) (precluding *simultaneous* litigation of separate, but related, claims in separate courts; ECD prohibits claim splitting).

▮ Were Seaview's interpretation of the ECD correct, the doctrine would accomplish exactly that which the New Jersey legislature sought to avoid: the expense and delay associated with piecemeal or multiple causes of action in numerous proceedings. Seaview avers that Derby *should* have filed its claims in New Jersey, despite the pendency of those claims here and despite Seaview's refusal to consent to such a filing.[3] Under Seaview's analysis, a claimant would be compelled to reassert its

claims in every other forum in which related litigation is initiated on the off-chance that a subsequent action is adjudicated first. This reasoning strains logic, as it promotes forum shopping and duplicitous litigation. In fact, the ECD requires only that a plaintiff bring all of its potential causes of action in a *single* lawsuit in a *single* forum. If a claimant omits a potential defendant or cause of action in its original complaint, the ECD bars that claimant from initiating a subsequent complaint to assert the omitted claim or to name the omitted defendant. *Printing Mart–Morristown, Inc.,* 650 F.Supp. at 1447; *Crispin v. Volkswagenwerk,* 96 N.J. 336, 476 A.2d 250 (1984). Similarly, the ECD prohibits the reassertion of claims previously filed.

Derby asserted all of its potential claims against Seaview in this litigation. It never sought to initiate a related, but unasserted, claim against Seaview in a subsequent proceeding. There is no question that Derby's conduct throughout this litigation has been consistent with the ECD and that it is entitled to a judgment in its favor to this affect.

However, even if by some gross distortion of the ECD, Seaview might invoke its mandate to bar Derby's cause of action, I would nonetheless refuse to apply it. The ECD is premised upon notions of basic fairness. "[T]he doctrine must be invoked flexibly and sensibly." *Crispin,* 476 A.2d at 258. "[T]he limits of a policy favoring mandatory joinder of claims ... [is] reached when the joinder would result in significant unfairness or jeopardy to a clear presentation of the issues and a just result." *Id.* at 260. In this case, even

---

3. The parties spend a considerable amount of time arguing whether Derby's claims against Seaview would have been time-barred had Derby elected to assert a cause of action against Seaview in the New Jersey litigation. Although there is support for the proposition that Derby's action in this court tolled the running of the statute of limitations in any subsequent litigation, resolution of this issue is unnecessary. Regardless of whether a cause of action by Derby against Seaview in New Jersey would have been time-barred, when Derby asserted all of its potential claims in this court, it obviated

any need to file claims in alternative jurisdictions, including New Jersey. The ECD supports, not proscribes, such restraint. It is also unnecessary for me to decide whether the settlement between Derby and Saybolt and the dismissal of their claims "with prejudice" in New Jersey constituted an "adjudication" for purposes of the ECD as I conclude that in any event, the ECD precludes the subsequent *filing* of claims previously asserted or which could have been asserted, not the subsequent *adjudication* of a previously-filed claim.

were Seaview to have presented me with a cognizable legal argument pursuant to the ECD, I would exercise my discretion to excuse joinder, and permit Derby to proceed with its claims.

### III. *Seaview's Motion for Summary Judgment*

In its motion for summary judgment, Seaview argues that Derby is collaterally estopped from asserting its negligence claim because the court in the New York action made the factual determination that Saybolt believed at the time of the disputed inspection that Seaview was using a deemulsifier in the cargo. It follows, according to Seaview, that it could not be negligent for failing to tell Saybolt that which Saybolt already accepted as being true. Seaview also maintains that as a matter of law, it had no independent duty to inform either Derby, Cities, or Caleb Brett if a deemulsifier was added to the cargo during transfer to the shore tanks. With respect to Derby's claims for breach of contract and unjust enrichment, Seaview makes two arguments which it believes entitles it to summary judgment: first "[t]he undisputed fact is that ... a deemulsifier was *not* used on the cargo," Seaview Mem. at 4; and second, that Derby "admitted" in the New York action that Saybolt's inspection was within accepted industry practice.

### A. Derby's Negligence Claim

In count one of its amended complaint, Derby argues that Seaview improperly injected a deemulsifier into the crude oil cargo *before* it was pumped to the shore tanks, but *after* Saybolt and Caleb Brett

had taken samples of the cargo to test for S & W content and API gravity.[4] Derby argues that Seaview negligently failed to inform Saybolt, Derby, Cities, and Caleb Brett about its injection of a deemulsifier into the cargo. According to Derby, the use of a deemulsifier was contrary to standard industry practice.

If Derby is correct that a deemulsifier was used, causing water to precipitate out of sediment in the oil cargo and out of sediment in the shore tanks, then a portion of the "water" element of the pre-discharge S & W figure became "free water" after discharge. The result is that Saybolt subtracted both its *pre-discharge* S & W figure and its *post-discharge* free water figure from the total volume of liquid cargo in Seaview's shore tank to determine crude oil actually delivered to Seaview. Derby billed Seaview only for this net amount. If, indeed, Seaview used a deemulsifier, Saybolt actually deducted the same amount of water twice in arriving at the net quantity of crude oil delivered. Therefore, if Derby is correct about the deemulsifier, Seaview received more barrels of crude oil than that for which it paid.[5]

Seaview denies that it used a deemulsifier in connection with the discharge of crude oil from the Hellespont Pride.[6] Nonetheless, it argues that even if a deemulsifier were used, Derby is collaterally estopped from arguing that Seaview was negligent in failing to inform Saybolt in advance of this fact because Judge Kram determined in *Cities Service v. Derby* that "the Saybolt inspector knew that Seaview was injecting a deemulsifier into the cargo as it was being unloaded into the shore

---

**4.** Unfortunately, it appears that no samples were taken of the cargo once it reached the shore tanks for purposes of comparing S & W content before and after discharge. The free water content, however, was measured both before and after discharge. The unusually large increase in free water content—almost 4,000 barrels—is what Derby attributes to Seaview's alleged improper use of a deemulsifier.

**5.** Derby attributes only a portion of the 9,474.07 barrels of crude oil which it claims Seaview received, but for which it did not pay, to the alleged use of a deemulsifier. The remaining alleged "windfall" is attributed to Saybolt's improper cargo sampling techniques which Derby

contends resulted in an S & W figure higher than actual S & W. The latter discrepancy forms the basis of Derby's breach of contract and unjust enrichment claims, which are discussed *infra* at III.B.

**6.** In section III.B., I conclude that there is a genuine issue of material fact as to whether Seaview used a deemulsifier in connection with the disputed discharge of crude oil. Therefore, in this section, I will address only Seaview's contention that it is entitled to summary judgment because Derby has failed to introduce probative evidence that it owed a duty to inform either Derby, Saybolt, Cities, or Caleb Brett about the use of a deemulsifier.

tanks." 654 F.Supp. at 502. Seaview also argues that Derby has come forward with no legal theory charging Seaview with a duty to notify either Derby, Cities Service, or Caleb Brett about the injection of a deemulsifier.

■ For Seaview to take advantage of the doctrine of collateral estoppel, it must satisfy four requirements: (1) the issue in the prior adjudication must be identical with the one presented in the later action; (2) there must have been a final judgment on the merits; (3) the party against whom the plea is asserted must have been a party to or in privity with a party in the prior adjudication; and (4) the party against whom it is asserted must have had a full and fair opportunity to litigate the issue in the prior action. *Kelly v. Warminster Township*, 512 F.Supp. 658, 664 (E.D.Pa. 1981), aff'd 681 F.2d 806 (3d Cir.), *cert. denied*, 459 U.S. 834, 103 S.Ct. 76, 74 L.Ed.2d 74 (1982). All four elements are satisfied here. The issue of Saybolt's knowledge of the use of a deemulsifier was before Judge Kram in *Cities Service v. Derby*. Judge Kram reached a final judgment on the merits and issued findings of fact and conclusions of law reported at 654 F.Supp. 492. Her judgment was affirmed by the Second Circuit. *Cities Service Co. v. Derby & Co., Inc.*, 835 F.2d 1429 (2d Cir.1987). Derby, of course, was a party to the New York action, and had a full and fair opportunity to litigate the issue of Saybolt's knowledge in that proceeding. Derby is thus collaterally estopped from relitigating that issue here.

As to Seaview's duty to inform Derby, Cities, and Caleb Brett about the injection of the deemulsifier, Derby does not dispute Seaview's contention that Seaview had no contractual relationship with either Cities or Caleb Brett, Cities' independent inspector. Furthermore, Derby has not explained how Seaview's failure to inform Cities or Caleb Brett caused harm to Derby. Since Cities and Derby were bound by a separate contract for the purchase, sale, and delivery of crude oil to which Seaview was not a party, or in privity with a party, Seaview owed no duty of care to Cities, or, for that matter, to Derby, insofar as the contract between Cities and Derby was concerned. Similarly, Seaview owed no duty of care to Caleb Brett, which was employed separately by Cities and which had no interest in the contract between Derby and Seaview.

Thus, with respect to Derby's negligence claim Seaview was not at fault for failing to inform Saybolt, Cities, and Caleb Brett about its use of a deemulsifier. As to Seaview's failure to notify Derby, Seaview argues that it "is unaware of any authority imposing a duty on a buyer of oil, such as Seaview, to notify the ... seller as to the buyer's internal storage practices." Seaview Mem. at 17. Derby argues that it intends to prove that the injection of a deemulsifier into crude oil during a discharge operation was contrary to accepted industry practice and constituted improper "tampering" with cargo.[7] According to Derby, Seaview had a duty to inform it of conduct outside the scope of their contract which directly affected the performance of that contract.

■ Seaview argues that Derby fails to proffer any evidence that Seaview, as a purchaser of oil, owed Derby, the seller, a duty to make it aware of Seaview's "internal storage practices." Whether or not Seaview owed Derby a duty to inform it of its internal storage practices is irrelevant to the negligence issue, however, since the deemulsifier was allegedly deposited into the cargo lines during discharge, *before* storage began. Seaview was likely aware that Saybolt would be inspecting and testing the cargo both before and after discharge to the shore tanks. Saybolt had not issued its survey report containing its test

---

7. Derby offers excerpts from the deposition testimony of two Cities' witnesses from the New York action to support its allegation that the injection of a deemulsifier was "unheard of" in the industry and thus beyond the scope of the contract. Seaview argues that this testimony is inadmissible hearsay and therefore cannot be introduced to oppose a motion for summary judgment. Fed.R.Civ.P. 56(e). The issue, however, is not whether the nonmoving party has produced evidence in a form that would be admissible at trial, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), but whether its proffer, "if reduced to admissible evidence, would be sufficient to carry respondent's burden of proof at trial," *id.* at 327, 106 S.Ct. at 2555.

results or its certification of those results at the time the deemulsifier was allegedly added; thus, if, indeed, a deemulsifier were added, Seaview should have known that this practice would affect Saybolt's calculations. The failure to disclose a material fact amounts to a misrepresentation where disclosure would correct a mistake as to a basic assumption and non-disclosure amounts to a failure to act in good faith and in accordance with standards of fair dealing. Restatement (Second) of Contracts, § 161. In this case, Seaview must have known that any addition of a deemulsifier would alter Derby's basic assumption as to how Saybolt was conducting its tests. The significant matter is not what Saybolt knew but what Derby knew. Derby's acceptance of Saybolt's miscalculation resulted from Seaview misrepresentation. Under the circumstances, Seaview's misrepresentation, at the very least, could amount to negligence and be the cause of Derby's loss.

### B. Derby's Breach of Contract and Unjust Enrichment Claims

Derby's breach of contract and unjust enrichment claims are premised on the allegations that (1) Seaview improperly added a deemulsifier to the oil cargo; and (2) that Saybolt's inspection was not made "in accordance with standard test methods generally accepted in the petroleum industry," as required in section 2.3 of the contract between Derby and Seaview. Seaview raises two defenses which it claims entitle it to summary judgment. First, Seaview maintains that the "undisputed facts" show that a deemulsifier was not used aboard the Hellespont Pride. Second, Seaview argues that Derby "admitted" in the New York action that there was no evidence a deemulsifier was used and that Saybolt's determinations were consistent with industry standards; thus, absent evidence to the contrary, Seaview is entitled to judgment in its favor on the basis of Derby's admissions. I will address each of Seaview's arguments in turn.

### 1. The Alleged Use of a Deemulsifier

■ To support its contention that Seaview injected a deemulsifier into the crude oil before discharge, Derby offers the same evidence which Cities offered against it in the New York action. Derby relies on the testimony of Seaview's vice president, William Grant, that it was "standard operating procedure" at the time for Seaview to inject a deemulsifier into cargo it received. Lynch affid. at Exh. E. Derby also relies on the deposition testimony of Joseph Shriver, Saybolt's inspector, who admitted, in connection with the New York action, that he had personal knowledge that Seaview was injecting a deemulsifier into the pipeline during cargo transfer. Lynch affid. at Exh. D. Finally, Derby offers evidence of the unprecedented and otherwise inexplicable increase in the quantity of free water found in the shore tanks as circumstantial evidence that a deemulsifier was added.

According to Seaview, Grant's admission is not helpful to Derby because Grant denied that he had personal knowledge that a deemulsifier was used on the *particular* cargo at issue. Nonetheless, Grant's testimony raises the issue of whether Seaview had a routine practice of adding a deemulsifier to *every* crude oil cargo. Derby may seek to call Grant as a witness under Federal Rule of Evidence 406 to establish that such a routine practice existed and to allow the jury to infer that Seaview's conduct aboard the Hellespont Pride conformed with this practice.[8]

Seaview appears to be making the argument that the affidavit of Ron Amey, its laboratory supervisor who maintained refrigeration records pertaining to the use of deemulsifiers, should somehow outweigh the Grant admission introduced by Derby. Relying on the records for the period February 28, 1981, through March 4, 1981, Amey denies that a deemulsifier was injected into the disputed cargo. Jacobson affid. at "Amey." Similarly, Seaview contends that Shriver's deposition testimony must be "disregarded" because he later "clarified"

---

**8.** Contrary to Seaview's assertion, Federal Rule of Evidence 602 would *not* preclude Grant from testifying at trial. Although Grant admittedly does not have "personal knowledge of the matter" concerning Seaview's use of a deemulsifier on the day in question, he claims to have "personal knowledge of the matter" concerning Seaview's routine practice of using deemulsifiers. This is all that Rule 602 requires for testimony to be admissible pursuant to Rule 406.

his testimony by stating that he had no personal knowledge that a deemulsifier was used with respect to the *particular* cargo at issue.

At the summary judgment stage, I do not sit as fact-finder and weigh evidence; my function is simply to decide if genuine issues of material fact exist. In this case, the use of a deemulsifier aboard the Hellespont Pride is clearly a disputed issue of material fact. At trial, Seaview may properly seek to explain away Grant's admission, if Grant is called, with Amey's refrigeration records. Seaview may challenge Shriver's credibility on the basis of his "conflicting" testimony.[9] Both Grant's and Shriver's testimony are relevant to the issue of whether Seaview, as a matter of routine business practice and with respect to the particular discharge from the Hellespont Pride, injected a deemulsifier into crude oil cargo.

Seaview admits that the purpose of adding a deemulsifier to crude oil is to cause water to precipitate at a faster rate. Both Saybolt and Caleb Brett inspectors have testified that a 4,000 barrel increase in free water from ship to shore tanks is "out of the ordinary." At trial, the fact-finder will draw the appropriate inferences from the large increase in free water content on the basis of Derby's evidence that Seaview routinely injects deemulsifiers into its cargo and Seaview's anticipated evidence to the contrary.

### 2. *Derby's Admissions*

■ Seaview correctly contends that Derby's pleadings and the joint pre-trial order it submitted in the New York action are admissible here as prior inconsistent statements. Although Derby's pleadings and its proposed findings of fact, submitted in accordance with the joint pre-trial order, may indeed be "party admissions," they are not "judicial admissions," and therefore are not conclusive. Federal Rule of Civil Procedure 8 has long permitted inconsistent pleadings. Similarly, courts have cautioned that where alternative or inconsistent statements or pleas from previous litigation are being introduced as admissions in a subsequent lawsuit, it is appropriate to allow the party against whom the admissions are offered a full and fair opportunity to demonstrate the existence of any issue of material fact. *Enquip, Inc. v. Smith-Mcdonald Corp.*, 655 F.2d 115, 118 (7th Cir.1981).

■ In this case, as previously discussed, Derby has raised a triable issue of material fact concerning Seaview's injection of a deemulsifier into the contested cargo. Despite its prior "admission" that there was no evidence that Seaview used a deemulsifier, Derby's introduction of the deposition testimony of Joseph Shriver and William Grant, as well as the undisputed 4,000 barrel discrepancy in free water content between ship and shore tanks, is sufficient to preclude summary judgment on that issue.

Seeking to escape the consequences of the contract language that Saybolt's determination about the quantity of oil delivered would be "conclusive and binding," Derby contends Saybolt's inspection methods were contrary to industry practice. This is the same argument that Cities used successfully against Derby in the New York action before Judge Kram. Seaview counters with Derby's statements in the New York action that Saybolt's inspection was proper. Seaview also introduces the deposition testimony of Joseph Hershman, Derby's "traffic manager," who testified that Derby relied on the inspector, Saybolt, to determine what methods were in accordance with general industry standards.

To support its argument that there are genuine issues of material fact as to the propriety of Saybolt's methods, Derby relies on Judge Kram's opinion and extensive findings. Of course, those findings would not be admissible at trial, *Trustees of the University of Pennsylvania v. Lexington Insurance Co.*, 815 F.2d 890, 905–06 (3d Cir.1987), but they show the availability of evidence to defeat the claim Seaview asserts. In addition, Derby has proffered expert testimony that Saybolt's methods

---

**9.** Regardless of Shriver's subsequent revelation that he, in fact, lacked personal knowledge that a deemulsifier was injected into the cargo at issue, his conviction that Seaview routinely injected deemulsifiers into its cargo beginning in February of 1981, remained consistent.

did not comply with industry standards. Seaview is not entitled to summary judgment on Derby's breach of contract and unjust enrichment claims.

IV. *Conclusion*

The adjudication of Derby's complaint is consistent with the New Jersey Entire Controversy Doctrine. Summary judgment will therefore be entered in favor of Derby and against Seaview on Seaview's supplemental motion for summary judgment. If Seaview used a deemulsifier, it may have caused harm to Derby for which Seaview is liable. As there are genuine issues of material fact, summary judgment must be refused.