**CONTINENTAL CASUALTY CO., and Transportation Insurance Co.**

v.

**DIVERSIFIED INDUSTRIES, INC., Theodore Sall, Inc., and AT & T Nassau Metals Corporation**

v.

**CONTINENTAL CASUALTY CO., Transportation Insurance Co., Transcontinental Insurance Co., Continental National Association, a/k/a CNA Insurance Companies, and CNA Financial Corporation.**

No. 91–7261.

United States District Court, E.D. Pennsylvania.

March 27, 1995.

---

John P. O'Dea, Stradley, Ronon, Stevens & Young, Philadelphia, PA, Stephen C. Baker, Stradley, Ronon, Stevens & Young, Wayne, PA, Eileen King Bower, Marsha K. Ross, Haskell & Perrin, Chicago, IL, Michael J. Miller, Stradley, Ronon, Stevens & Young, Malvern, PA, J. Andrew Douglas, Martin T. Lee, Karen L. Bizzini, Christine D. Ryan, Long and Levit, Los Angeles, CA, for plaintiffs Continental Cas. Co. et al.

Neal A. Jacobs, Matthew J. Siembieda, Carl D. Buchholz, III, Blank, Rome, Comisky & McCauley, Philadelphia, PA, Louis F. Bonacorsi, Couburn and Croft, St. Louis, MO, Terry L. Trantina, Arthur H. Saiewitz, AT & T, Basking Ridge, NJ, John H. Gross, Robert M. Horkovich, Steven R. Dolmanisth,

Anderson, Killholick, O'Shinsky, New York City, for defendants Diversified Industries, Inc., et al.

Neal A. Jacobs, Matthew J. Siembieda, Blank, Rome, Comisky & McCauley, Philadelphia, PA, Louis F. Bonacorsi, Bruce D. Ryder, Ellen E. Bonacorsi, Joseph G. Nassif, Larry A. Reed, Couburn and Croft, St. Louis, MO, Terry L. Trantina, Arthur H. Saiewitz, AT & T, Basking Ridge, NJ, John H. Gross, Robert M. Horkovich, Steven R. Dolmanisth, Anderson, Killholick, O'Shinsky, New York City, for defendants AT & T Nassau Metals Corp. et al.

J. Andrew Douglas, Martin T. Lee, Karen L. Bizzini, Christine D. Ryan, Long and Levit, Los Angeles, CA, for Transcontinental Ins. Co.

Kean K. McDonald, LaBrum and Doak, Philadelphia, PA, for Continental National Ass'n.

David J. Parsells, Kean K. McDonald, Pamela Tobin, LaBrum & Doak, Philadelphia, PA, Stephen C. Baker, Stradley, Ronon, Stevens & Young, Malvern, PA, for CNA Financial Corp.

## OPINION

CAHN, Chief Judge.

This litigation was commenced by an insurance company seeking a declaratory judgment that it is not obligated to provide insurance coverage for the remediation of environmental damage which was caused, in part, by its insureds. The insureds have responded with several counterclaims. Numerous motions are currently before the court. Jurisdiction is proper pursuant to 28 U.S.C. § 1332.

## I. Background

Continental Casualty Company ("Continental") and Transportation Insurance Company ("Transportation") (collectively, the "plaintiffs") are Illinois corporations having their principal places of business in Chicago, Illinois. Diversified Industries, Inc. ("Diversified"), is a Delaware corporation having its principal place of business in St. Louis, Missouri. Diversified and its subsidiaries held a "Comprehensive General Liability" insurance policy ("CGL policy") with plaintiffs from 1968 until October 31, 1991.

During the period of coverage, Eastern Diversified Metals Corporation ("EDM"), one of Diversified's subsidiaries, operated a metal reclamation facility in Schuylkill County, Pennsylvania (the "Site"). At the Site, EDM reclaimed copper and aluminum from telecommunication cables and wires. The reclamation process involved mechanically stripping and separating the plastic insulation surrounding the wire. EDM stored the excess insulation material, known as "plastic fluff," on an adjacent piece of land. It was later discovered that this excess material contained contaminants.

In 1977, EDM sold the Site to Theodore Sall, Inc. ("Sall"), another subsidiary of Diversified. In March of 1987, the Environmental Protection Agency ("EPA") notified Sall and over 170 other businesses that they were Potentially Responsible Parties ("PRP's") under Section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et. seq.* As such, they would be responsible for the clean-up costs associated with the hazardous material collected at the Site between approximately 1968 and 1977. Diversified informed plaintiffs of the EPA's claim and demanded that plaintiffs both defend against the EPA's claim and reimburse Diversified for any expenditures associated with cleaning up the Site.

In November 1991, plaintiffs filed this declaratory judgment action against Diversified. Plaintiffs sought a determination of whether they were obligated to indemnify Diversified for costs incurred in cleaning-up the Site. The court has been notified that the cost of the clean-up could exceed $300 million.[1]

---

1. Although there is still some confusion as to what steps ultimately will be required to remediate the environmental damage, the EPA has notified the parties that a recycling center must be built and maintained at the Site. According to the parties' projections, the cost of such a recycling center would exceed $300 million.

This litigation has proceeded slowly, and has required the court to rule on various pretrial motions. For instance, this court has denied Diversified's motion to dismiss based upon the doctrine of forum non conveniens. *See* Order (April 13, 1992). The court has also held that Pennsylvania law controls the plaintiffs' declaratory judgment action. *See* Order (February 22, 1993). In addition, the litigation was delayed when, in March 1993, Diversified declared bankruptcy and this case was automatically stayed. *See* 11 U.S.C. § 362. The bankruptcy court lifted the stay on May 25, 1993.

After the stay was lifted, the plaintiffs moved to amend their complaint to include Sall and AT & T Nassau Metal Corporation ("AT & T") as parties to the action. Plaintiffs sought to add Sall because, like Diversified, Sall was a named insured under the CGL policies. Therefore, plaintiffs asserted that the issues raised by their denial of liability with respect to Diversified were the same as for Sall. Plaintiffs sought to add AT & T because AT & T was a major supplier to the Site during the relevant times, and had been notified by the EPA that it was a PRP. After incurring costs in responding to the EPA's action, AT & T sued Sall for, *inter alia*, contribution. *See AT & T Nassau Metal Corp. v. Fixman & Sall*, Civil Action No. 93–001601 (E.D.Mo.1993) (the "Missouri Case"). Therefore, plaintiffs argued that, depending upon the outcome of this litigation, they could be required to defend and indemnify Sall against AT & T's claims. The court granted plaintiffs leave to amend their complaint. On March 23, 1994, plaintiffs filed their Amended Complaint against Diversified, Sall, and AT & T.

Diversified and its subsidiaries then entered into a settlement with AT & T which contained both an assignment (the "Assignment") and an agreement (the "Agreement"). The Assignment provided, in part, that AT & T would be assigned Diversified's potential right of recovery against the plaintiffs and would be given the power to prosecute this litigation. The Agreement stated that the parties would enter a Consent Decree to settle the Missouri Case. The Consent Decree provided that Diversified, Sall, EDM (now known as "Scullin"), and United Refining and Smelting Company ("United"), another Diversified subsidiary, were liable for "damages, expenses, and remediation and removal costs" arising from their status as PRP's for the EDM Site. In addition, the Consent Decree stated that:

> (i) as between [Sall], Diversified, and Scullin and AT & T . . . , that [Sall], Diversified, and Scullin are jointly and severally liable for 90% of the above-described liability at the [EDM Site]; and (ii) as between United and AT & T . . . , United is liable for a de minimis portion of the above-described liability at the [EDM Site].

Although the plaintiffs objected to the Agreement, the Bankruptcy Court overseeing Diversified's Chapter 11 proceeding approved it.

On October 10, 1994, Diversified, Sall, and AT & T (the "defendants" or "counterclaim plaintiffs") answered the plaintiffs' amended complaint, asserting various affirmative defenses. In addition, the defendants alleged various counterclaims against the plaintiffs and other entities related to the plaintiffs. Specifically, defendants counterclaimed against Continental, Transportation, Transcontinental Insurance Company ("Transcontinental"), Continental National Association a/k/a CNA Insurance Companies ("CNA Insurance"), and CNA Financial Corporation ("CNA Financial") (collectively "counterclaim defendants" or the "CNA Companies"). The defendants' counterclaims sound in breach of contract, misrepresentation under the Illinois Consumer Fraud and Deceptive Business Practices Act, violation of the Illinois Consumer Fraud and Deceptive Practices Act, negligent provision of loss control services, conspiracy to misrepresent or conceal facts, and bad faith.

Several motions are currently before the court. First, the defendants have moved this court to reconsider its ruling that the plaintiffs have not failed to join indispensable parties. Second, the counterclaim defendants have moved to dismiss or strike the defendants' counterclaims on various grounds. Third, Diversified and Sall have moved for default judgment against Continental, Transportation, and Transcontinental

based upon the failure of those parties to answer Diversified and Sall's counterclaims. Finally, CNA Financial has moved this court to dismiss all causes of action filed against it on the grounds that the court lacks jurisdiction to adjudicate such claims.

## II. Defendants' Motion to Reconsider

■ On August 19, 1994, this court denied defendants' motion to dismiss this case based upon the plaintiffs' alleged failure to join indispensable parties to this litigation. Defendants have moved this court to reconsider its ruling. The purpose of a motion for reconsideration is to "correct manifest errors of law or fact or to present newly-discovered evidence." *Harsco Corporation v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir.1985). Because federal courts have a strong interest in the finality of judgments, motions for reconsideration should be granted sparingly. *Rottmund v. Continental Assurance Company*, 813 F.Supp. 1104, 1107 (E.D.Pa.1992).

Defendants contend that there are various parties who are indispensable to this litigation pursuant to Federal Rule of Civil Procedure 19. The defendants argue that all parties who have been deemed PRP's based upon their activities at the Site (the "PRP Group") must be joined. In addition, the defendants claim that United and Scullin must be joined in this litigation because they are named insureds under the CGL policies. Defendants conclude that this case must be dismissed because diversity jurisdiction will be lacking once these parties are joined. Because the court finds that neither the PRP Group nor United and Scullin must be joined in this litigation, the court will deny defendants' motion to reconsider and will retain jurisdiction over the case.

■ Federal Rule of Civil Procedure 19 governs this court's determination of whether the joinder of United, Scullin, and the PRP Group is compulsory.[2] When making this determination, the "court must first determine whether a party should be joined if 'feasible' under Rule 19(a)." *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 404 (3d Cir.1993). If the party should be joined but joinder is not feasible because it would destroy diversity, the "court must then determine whether the absent party is 'indispensable' under Rule 19(b)." *Id.* If the party is indispensable, the action cannot proceed.

**2.** Defendants have cited *Vale Chemical Company v. Hartford Accident & Indemnity Company*, 512 Pa. 290, 516 A.2d 684 (1986), to support their claim that United, Scullin and the PRP Group are indispensable. In *Vale*, the Pennsylvania Supreme Court held that, under Pennsylvania's Declaratory Judgment Act, 42 Pa.C.S. §§ 7531–7541, Pennsylvania courts lack jurisdiction to determine an insurer's duty to defend or indemnify unless the injured claimants are joined in the action. *But see J.H. France Refractories Company v. Allstate Insurance Company*, 521 Pa. 91, 555 A.2d 797 (Pa.1989) (limiting *Vale* to those claimants who asserted claims prior to the date when the declaratory judgment action was filed). Pennsylvania's interpretation of its Declaratory Judgment Act does not bind this court's determination of indispensability under Federal Rule 19. *See Shetter v. Amerada Hess Corporation*, 14 F.3d 934 (3d Cir.1994) (although under Virgin Islands law Commissioner of Department of Labor is an indispensable party, Commissioner not indispensable as a matter of federal law). This is because, "in a diversity case the question of joinder is one of federal law." *Provident Tradesmens Bank & Trust Company v. Patterson*, 390 U.S. 102, 125 n. 22, 88 S.Ct. 733, 746 n. 22, 19 L.Ed.2d 936 (1968). In addition, a party's indispensability under Rule 19 is not a matter of per se rules; instead, it is determined on a case-by-

case basis. *Id.* at 117 n. 12, 88 S.Ct. at 742 (noting that the decision of whether a party is indispensable "must be made on the basis of practical considerations, and not by 'prescribed formula'") (citations omitted). Therefore, Pennsylvania law will be referenced only to help decipher the interest of United, Scullin, and the PRP Group in being joined. It will not be used to determine the ultimate question of indispensability under Rule 19. *See Shetter*, 14 F.3d at 938.

The court notes that in *Federal Kemper Insurance Company v. Rauscher*, 807 F.2d 345, 354 n. 5 (3d Cir.1986), the Court of Appeals seemed to approve of *Vale* as setting forth the correct standard for indispensability under Rule 19. However, as Judge Brody has noted, the discussion of *Vale* in *Federal Kemper* arose merely in a single footnote and was not essential to the Court of Appeals' holding. *See Scott Paper Company v. National Casualty Company*, 151 F.R.D. 60, 61 (E.D.Pa.1993) (noting that the Court of Appeals, in dicta, seemed to suggest that the reasoning of *Vale* is to be followed as a matter of federal law). In addition, in light of the Court of Appeals' decision in *Shetter*, it is clear that state law is not determinative of a party's indispensability under federal law.

Rule 19(a) defines the parties whose joinder is compulsory if "feasible."[3] Rule 19(a) states in pertinent part:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the party's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Federal Rule of Civil Procedure 19(a).

## A. *The PRP Group*

■ Defendants contend that the PRP Group satisfies Rule 19(a)(2) because the PRP Group may be able to sue the defendants for contribution, and that therefore a ruling in favor of the plaintiffs will irreparably harm the PRP Group. However, even if the defendants' prediction were to come true, the court is not persuaded that such an outcome makes the PRP Group indispensable.

Under Rule 19(a)(2), the "interest relating to the subject of the action" must be more than a mere financial interest. 3A Moore's Federal Practice § 19.07[2]; *Micheel v. Haralson,* 586 F.Supp. 169, 171 (E.D.Pa.1983); *Cortez v. County of Los Angeles,* 96 F.R.D. 427, 429 (C.D.Cal.1983); *Swarovski American Ltd. v. Silver Deer Ltd.,* 537 F.Supp. 1201, 1206 (D.Colo.1982). Instead, to satisfy Rule 19(a)(2), an absent party must have a legally protected interest, and not merely an interest of convenience.

The PRP Group is not necessary to the court's determination of whether the plaintiffs must indemnify Diversified and its affiliates for the costs associated with the cleanup of the Site. In addition, the PRP Group has not incurred any significant clean-up costs for the site, and there is no evidence that any such costs are imminent.[4] Therefore, the possibility of a contribution action by the PRP Group against the defendants appears remote. However, even if it were likely that a future contribution action would be brought by the PRP Group, the court would nevertheless conclude that the PRP Group's interest in this litigation is not the kind of legally protected interest contemplated by Rule 19(a)(2). The PRP Group does not have any common law or other right to coverage under the CGL policies. Instead, this litigation might merely effect the amount of money which the PRP Group might be able to recover from the defendants from such a contribution suit. This purely financial interest is insufficient. The PRP Group fails to satisfy Rule 19(a), and, accordingly, the PRP Group need not be joined.

This conclusion comports with relevant precedent. For instance, in *Scott Paper Company v. National Casualty Company,* 151 F.R.D. 577 (E.D.Pa.1993), an individual sued the Scott Paper Company in state court after slipping and falling on Scott's land. Scott then filed a declaratory judgment action in federal court against its insurer, National Casualty, seeking an adjudication that National Casualty was obligated to defend and indemnify Scott in the state court action. National Casualty moved to dismiss based upon Scott's failure to join the injured claimant in the suit. National Casualty argued that the claimant was necessary because "the result of [the] dispute may have a substantial impact on [the individual claimant's] potential recovery from Scott Paper". *Id.* at 579. The court denied the motion, holding that the claimant's interest was insufficient to make him indispensable to the court's determination of whether National Casualty had a duty to defend and indemnify Scott. *Id.*

---

**3.** In order to avoid confusion, Rule 19 does not use the traditional term "necessary" to describe these parties. Therefore, the court will follow the lead of the Court of Appeals in referring to these parties as parties whose joinder is compulsory if feasible. *See Janney,* 11 F.3d at 404 n. 4.

**4.** The court has been notified that certain members of the PRP Group have contributed some money to the clean-up of the Site. However, the amount of money expended by the PRP Group apparently is not significant. No contribution actions have been filed by the PRP Group.

## B. *United and Scullin*

■ Defendants argue that United and Scullin are indispensable to this litigation because they are named insureds under the CGL Policies. Defendants contend that a ruling in favor of the plaintiffs will prejudice United and Scullin, and that therefore these parties must be joined. Because the court finds United's and Scullin's interests in the present litigation to be more theoretical than real, however, the court disagrees.

Rule 19(a)(2) directs courts to consider the practical consequences that an action may have on an absent party. With this in mind, the court easily concludes that the present action will have very little effect on United or Scullin. This is because their rights to pursue coverage from the plaintiffs have been assigned to AT & T.[5] Therefore, even if plaintiffs prevail in this litigation, the practical effect on United and Scullin would be minimal.

United's and Scullin's interests in this litigation are being fully represented by AT & T. This fact distinguishes the present case from *Pennsylvania Insurance Guaranty Association v. Schreffler*, 360 Pa.Super. 319, 520 A.2d 477 (1987).[6] In *Schreffler*, an insurer brought a declaratory judgment action against one of its insured's claimants, Schreffler. The court ruled that the insured, Keenan's Tavern, was an indispensable party. The court explained that the divergent interests between the insurer and Keenan's Tavern made Keenan's Tavern indispensable. The court stated:

> In its request for declaratory relief, [the insurer] asked the trial court to interpret the ... insurance policy with respect to the coverage available for [Schreffler's] suit against Keenan's Tavern. Clearly, Keenan's Tavern had an interest in seeing

that the court construed its insurance policy as providing the maximum amount of coverage for any judgment entered against it in the Schreffler action. Keenan's Tavern also had an interest in ensuring that [the insurer] performed its obligations to defend Keenan's Tavern in the Schreffler action. Obviously, these interests have not been presented by [the insurer], who contended below and contends on appeal that no coverage is available under the Policy.

*Id.* at 479.

Unlike the insured in *Schreffler*, United's and Scullin's interests are being fully represented by AT & T. AT & T has been assigned United and Scullin's rights under plaintiffs' insurance policies, and has every incentive to vigorously pursue these rights.

This court's conclusion is consistent with the case relied upon most heavily by the defendants. In *Travelers Indemnity Company v. Dingwell*, 691 F.Supp. 503 (D.Me. 1988), *aff'd*, 884 F.2d 629 (1st Cir.1989), a landfill owner assigned his right to insurance proceeds to a group of polluters (the "Group") who had already paid for most of the mandated environmental cleanup at the landfill. In return for the assignment, the Group agreed to drop its claim for contribution against the owner and seek satisfaction of the owner's obligations solely from the insurance proceeds. In determining that the Group was indispensable to the declaratory judgment action brought by the insurer against the owner, the court stated:

> [The owner's] interest is now negligible, since he has assigned the right to the proceeds to the Group, and, under the agreement, will not be pursued for any recovery out of his personal assets.

*Id.* at 505.

Like the owner in *Dingwell*, Scullin's and United's interest in this litigation is negligi-

---

**5.** Defendants claim that this court's initial determination with regard to the status of United and Scullin *implicitly depended upon the validity of the Assignment.* They argue that United and Scullin would have had their interests irreparably harmed were this court to proceed in their absence but then find the Assignment to be invalid. For the reasons stated below, however, the court finds the Assignment to be enforceable as a matter of Pennsylvania law. Therefore, because AT & T properly has been assigned Diversified's rights under the CGL Policies, the court need not

address defendants' argument that the interests of United and Scullin may not be adequately represented in this litigation.

**6.** *Schreffler* does not bind this federal court's determination under Rule 19. However, because the facts in *Schreffler* illustrate the type of prejudice which may occur when an insured is not joined in an insurer's declaratory judgment action, it is helpful to the present discussion.

ble. They have assigned their rights to AT & T, who seeks to fully enforce the CGL policies. Accordingly, the court finds that United and Scullin are not indispensable, and will retain jurisdiction over this case.

### III. Counterclaim Defendants' Motions to Dismiss AT & T's Counterclaims

The counterclaim defendants have offered several reasons why this court should dismiss AT & T's various counterclaims.[7] In deciding the counterclaim defendants' motions, the court will accept all facts alleged by AT & T as true, and will grant the counterclaim defendants' motions only if AT & T could prove no set of facts entitling it to relief. *Malia v. General Electric Company*, 23 F.3d 828, 830 (3d Cir.1994); *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir.1994). The various arguments offered by the counterclaim defendants will be addressed seriatim.

#### A. *Validity of the Assignment*

■ Counterclaim defendants contend that language found within some of the CGL Policies (the "non-assignment clauses") precluded Diversified from assigning its rights under the CGL Policies to AT & T without the consent of the CNA Companies.[8] Typical of the various non-assignment clauses is the following:

Assignment. Assignment of the interest under this policy, shall not bind the company until its consent is endorsed thereon. . . .

*See,* Amended Complaint for Declaratory Judgment, Exhibit M, Page 5 of Commercial Umbrella Liability Policy, § 16. However, because Pennsylvania law favors assignments of the sort contemplated by Diversified and

AT & T, the court holds that the Assignment is valid.[9]

■ Generally, non-assignment clauses are included in insurance policies for the protection of insurers. Such clauses are designed to guarantee that an increase of the risk of loss by a change of the policy's ownership cannot occur without the consent of the insurer. *See* Couch Cyclopedia of Insurance Law 2d, Volume 16, § 63:31. Because non-assignment clauses limit the amount of risk that the insurer may be forced to accept, courts will generally strike down an insured's attempt to assign its policy to a new insured. *See, e.g., Carle Place Plaza Corporation v. Excelsior Insurance Company*, 144 A.D.2d 517, 534 N.Y.S.2d 397 (1988). Consistent with the general purposes of non-assignment clauses, however, courts are reluctant to restrict the assignment of an insured's right to payment which has already accrued. *See, e.g., Santiago v. Safeway Insurance Company*, 196 Ga.App. 480, 396 S.E.2d 506 (1990); *National Memorial Services, Inc. v. Metropolitan Life Insurance Company*, 355 Pa. 155, 49 A.2d 382 (1946). Therefore, because an insured's right to proceeds vests at the time of the loss giving rise to the insurer's liability, restrictions on an insured's right to assign its proceeds are generally rendered void.

In *National Memorial Services*, the Pennsylvania Supreme Court was confronted with a situation analogous to the one at bar. There, the beneficiaries of a life insurance policy assigned their proceeds from the policy to another individual. This individual subsequently assigned the proceeds to National Memorial Services. The insurer refused to

---

7. As will be discussed, there is some confusion about whether the counterclaims have been brought by AT & T, or by AT & T along with the other defendants. The current discussion of the validity of AT & T's counterclaims applies with equal force to all of the defendants.

8. There is some controversy involving the various non-assignment clauses contained within the CGL Policies. AT & T points out that the non-assignment clauses do not appear in each of the policies issued by the CNA Companies. In addition, the counterclaim defendants have questioned the existence of the CGL policies for the years 1966 to 1974. The court need not address

these issues at the present time, however, as the issue presented by counterclaim defendants' motion to dismiss is whether the non-assignment clauses, if present, are effective to nullify the Assignment to AT & T.

9. AT & T maintains that the Assignment is valid under both Pennsylvania and Illinois law. The court need not address AT & T's contentions with regard to Illinois law, however, since this court has previously ruled that Pennsylvania law, alone, governs the interpretation of the CGL Policies. *See* Order (February 22, 1993).

pay National Memorial based upon the following language contained in the policy:

> Assignability—This Policy may be assigned to any national bank, state bank, or trust company, but any assignment or pledge of this Policy or of any of its benefits to an assignee other than one of the foregoing shall be void.

The court rejected the insurer's argument. Although the court stated that it could "understand why an insurer would limit the right of an insured to assign his interests in a policy," it found "no sound reason for the insurance company to forbid or limit an assignment by a beneficiary of the amount due him or her after the .death of the insured." *Id.* at 382–383. Addressing the issue more generally, the court wrote:

> Text writers and judicial decisions very generally recognize that stipulations in policies forbidding an assignment, except with the insurer's consent, apply only to assignments before loss or death of the insured or the maturity of the policy. An assignment of the policy or rights thereunder after the occurrence of the event, which

creates the liability of the insurer, is not, therefore, precluded.

*Id.* at 383.[10] *See also Gray v. Nationwide Mutual Insurance Company,* 422 Pa. 500, 223 A.2d 8 (1966) (because insured's breach of contract claim against insurer for failure to pay for past injury was not personal in nature, such claim could be assigned); *Santiago,* 396 S.E.2d at 508 ("interest in the proceeds of a policy after a loss to the insured has occurred may be assigned just as any other chose in action"). *See generally* "Assignability of Insured's Right to Recover Over Against Liability Insurer for Rejection of Settlement Offer," 12 A.L.R.3d 1158 (1967).[11]

Later Pennsylvania Superior Court cases shed further light on this issue. For instance, in *Alfiero v. Berks Mutual Leasing Company,* 347 Pa.Super. 86, 500 A.2d 169 (1985), the court held that an insured could assign its rights to insurance proceeds to an injured claimant because the insurer had breached its contract with the insured. The court explained that the insurer's refusal to participate in the resolution of the claimant's

---

**10.** Leading commentators have noted the different effect given to restrictions placed upon an insured's assignment of the insurance *policy* as ·opposed to the assignment of insurance *proceeds:*

> [T]he great weight of authority supports the rule that general stipulations in policies prohibiting assignments thereof except with the consent of the insurer apply to assignments before loss only, and do not prevent an assignment after loss, for the obvious reason that the clause by its own terms ordinarily prohibits merely the assignments of the policy, as distinguished from a claim arising thereunder, and the assignment before loss involves a transfer of a contractual relationship while the assignment after loss is the transfer of a right to a money claim.

Couch on Insurance 2d, Volume 16, § 63:40 (1983).

> An assignment of the policy after an injury insured against has occurred and the liability of the insurance company has become fixed is valid and transfers to the assignee the right to the proceeds of the insurance, even though the insurance company has not consented to an assignment and the policy contains a provision prohibiting its assignment without such consent ...

46A C.J.S. § 1405 (1993).

**11.** Counterclaim defendants have cited two Pennsylvania Superior Court cases which support their argument that the Assignment to AT &

T was invalid. *See High–Tech–Enterprises v. General Accident Insurance Company,* 430 Pa.Super. 605, 635 A.2d 639 (1993); *Fran and John's Doylestown Auto Center v. Allstate Insurance Company,* 432 Pa.Super. 449, 638 A.2d 1023 (1994). Both of these courts relied upon non-assignment clauses to invalidate insureds' assignment of their rights to insurance proceeds. *See also Treegoob v. Cohen,* 45 D. & C.3d 489 (1987).

This court must follow the decisions of the Pennsylvania Supreme Court when interpreting Pennsylvania law. *City of Philadelphia v. Lead Industries Association,* 994 F.2d 112, 119 (3d Cir.1993). Therefore, even though these newer Pennsylvania Superior Court cases appear to be in direct conflict with the reasoning of the older Pennsylvania Supreme Court cases of *National Memorial* and *Gray,* this court must assume that *National Memorial* and *Gray* control the present litigation.

In addition, the court notes that neither *High–Tech* nor *Fran and John's* cited *National Memorial* or *Gray,* or attempted to explain why the non-assignment clauses at issue were to be given effect. Instead, these courts merely looked to the language of the policy in striking down the attempted assignments. This approach contradicts *National Memorial,* which held that a non-assignment clause was not to be given effect where its operation would invalidate an assignment of insurance proceeds.

case constituted a breach of the contractual duty of good faith and a repudiation of the insurance contract.

■ In the present case, there has been no determination that the counterclaim defendants have breached their duty to defend. However, a determination of an insurer's breach is not a prerequisite to the insured's assignment. *Barr v. General Accident Group Insurance Company*, 360 Pa.Super. 334, 520 A.2d 485, 489, *appeal denied*, 517 Pa. 602, 536 A.2d 1327 (1987). A mere denial of coverage by an insurer triggers an insured's right to assign its rights to an injured claimant. As the *Barr* court stated:

> We think the insured should be allowed, as soon as the insurer denies coverage, to protect its interest by negotiating a settlement. The only valuable asset the insured may have is its cause of action against the insurer and the insured should be able to assign this right to the injured party to protect itself from further liability.

*Id.* at 489.

In the present case, the injury which could potentially place liability upon the CNA Companies—the environmental damage—occurred prior to the assignment. Because the assignment did not increase the amount of risk which the CNA Companies will face, but merely changed the name of the party to whom any payment may be made, it passes muster under *National Memorial*. In addition, counterclaim defendants have denied coverage to Diversified and its affiliated companies. Under *Barr*, this denial provides the insureds with the right to assign their interests in the policy proceeds to AT & T. The assignment to AT & T is valid. Therefore, despite the fact that AT & T was not directly owed a duty in its own right by the insurer, AT & T may proceed directly against the counterclaim defendants. *See Gray*, 223 A.2d at 11. Accordingly, counterclaim defendants' motion to dismiss AT & T's claims based upon the assignment's invalidity is denied.

## B. *The Law Governing AT & T's Counterclaims*

AT & T alleges that the counterclaim defendants' actions constitute a breach of contract, misrepresentation under the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½, para. 261 *et seq.* (the "Consumer Fraud Act"), a violation of the Consumer Fraud Act, negligent provision of loss control services, conspiracy to misrepresent or conceal facts, and bad faith. Counterclaim defendants have moved to dismiss AT & T's counterclaims, claiming that AT & T's counterclaims must arise out of the law of Pennsylvania, not Illinois. Although the court disagrees with counterclaim defendants' explanation of why AT & T's counterclaims must arise out of Pennsylvania law, the court agrees that Pennsylvania law controls.

### 1. *Law of the Case*

■ On February 22, 1993, this court held that Pennsylvania law governs this court's determination of the plaintiffs' declaratory judgment action.[12] *See* (Order February 22, 1993) (the "1993 Order"). Counterclaim defendants contend that the 1993 Order has become the law of the case, and governs all aspects of the instant litigation. Counterclaim defendants therefore conclude that AT & T's counterclaims cannot arise under Illinois law. The court disagrees.

The law of the case doctrine was developed "to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." *Casey v. Planned Parenthood*, 14 F.3d 848 (3d Cir. 1994) (quoting 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Rules and Practice Procedure § 4478 (1981)). The doctrine dictates that "when a court decides upon a rule of law, that rule should continue to govern the same issues in subsequent stages in the litigation." *In re Resyn Corporation*, 945 F.2d 1279, 1281 (3d Cir. 1991) (quoting *Devex Corporation v. General Motors Corporation*, 857 F.2d 197, 199 (3d

---

12. AT & T, along with Diversified and Sall, has argued repeatedly that this court's 1993 Order is incorrect, and that Illinois law governs the interpretation of the CGL Policies. However, because there is not currently a motion to reconsider whether Pennsylvania or Illinois law applies to the interpretation of the CGL Policies, the court need not re-address the issue at this time.

Cir.1988)). Law of the case rules apply "both to issues expressly decided by a court in prior rulings and to issues decided by necessary implication." *Bolden v. Southeastern Pennsylvania Transportation Authority,* 21 F.3d 29, 31 (3d Cir.1994) (citing *Doe v. New York City Department of Social Services,* 709 F.2d 782 (2d Cir.1983)). The law of the case doctrine merely "directs a court's discretion, it does not limit the tribunal's power." *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983); *Bloom v. Consolidated Rail Corporation,* 812 F.Supp. 553, 556 (E.D.Pa.1993), *rev'd on other grounds,* 41 F.3d 911 (3d Cir.1994).

It is axiomatic that "the doctrine of the law of the case comes into play only with respect to issues previously determined." *Quern v. Jordan,* 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 1148 n. 18, 59 L.Ed.2d 358 (1979). The only issue before this court at the time it issued its 1993 Order was whether the plaintiffs' declaratory judgment action, based upon the language of the CGL Policy, was to be governed by Pennsylvania or Illinois law. In deciding that Pennsylvania law governed the interpretation of the CGL Policies, the court expressed no opinion with regard to any counterclaims that might be filed. Moreover, the 1993 Order does not necessarily imply that all counterclaims later filed would be governed by Pennsylvania law.[13] Accordingly, because the issue currently before the court was not at issue in 1993, the court concludes that the law of the case doctrine does not mandate that AT & T's counterclaims arise under Pennsylvania law.[14]

2. *The Relationship Between AT & T's Contract and Tort Claims*

■ Counterclaim defendants also argue that, even if the law of the case doctrine does not directly apply, AT & T's counterclaims are so closely related to the CGL Policies that Pennsylvania law governs them. In making this argument, counterclaim defendants rely heavily upon *Unibase Systems, Inc. v. Professional Key Punch,* No. CIV.A. 86–213, 1987 WL 41873 (D.Utah July 15, 1987), and *First Commodity Traders v. Heinold Commodities,* 591 F.Supp. 812 (N.D.Ill. 1984), *aff'd,* 766 F.2d 1007 (7th Cir.1985). Because these cases are easily distinguished from the present situation, however, the court disagrees.

In both *Unibase* and *First Commodities,* the contracts at issue contained choice of law provisions. For instance, the contract at issue in *Unibase* stated:

> This agreement and any controversy between the parties relating to the subject matter of this agreement shall be governed by the laws of the State of Utah.

*Unibase,* at *2. The *Unibase* court concluded that this choice of law provision governed tort claims which were closely related to the subject matter of the contract. *Unibase,* at *5.

At the outset, the court notes that the reasoning of *Unibase* and *First Commodities* has not been accepted by all courts which have considered contractual choice of law provisions. For instance, in *Jiffy Lube International v. Jiffy Lube,* 848 F.Supp. 569 (E.D.Pa.1994), the court explained that contractual choice of law provisions "do not govern tort claims between contracting parties unless the fair import of the provisions embraces all aspects of the legal relationship." *Id.* at 576. Similarly, in *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.,* 971 F.2d 401 (9th Cir.1992), the court explained that "claims arising in tort are not ordinarily controlled by a contractual choice of law provision." *Id.* at 407 (citations omitted). *See also Consolidated Data Terminals v. Applied*

---

**13.** AT & T has argued that because it was not yet involved in this litigation in February 1993, it should not be bound by this Court's 1993 Order. The court disagrees. AT & T has been assigned Diversified's and Sall's rights under the CGL Policies. Accordingly, AT & T is bound by all prior determinations of Diversified and Sall's rights with regard to the Policies.

**14.** Before assigning its rights to AT & T, and prior to this court's 1993 Order, Diversified alleged a counterclaim against plaintiffs. However, the parties did not address the choice of law issues with regard to the counterclaim at the time of the 1993 Order. Therefore, the 1993 Order does not control the court's present determination of whether AT & T's counterclaims must arise under Pennsylvania or Illinois law.

*Digital Data Systems,* 708 F.2d 385, 390 n. 3 (9th Cir.1983) ("other issues in this case, which involve tort law and the law of punitive damages, are not controlled by the contract choice of law provision"); *Computerized Radiological Services, Inc. v. Syntex Corporation,* 595 F.Supp. 1495 (E.D.N.Y.1984) ("although the contract claim is governed by California law—by choice of the parties—a tort claim arising out of the contract may be governed by the law of a different forum."), *aff'd,* 786 F.2d 72 (2d Cir.1986).

More important than the precedential value of *Unibase* or *First Commodities,* however, is the fact that, even if correct, these cases do not apply to the present litigation. None of the parties has alleged that any of the CGL Policies contain choice of law provisions. Such provisions are the foundation upon which the reasoning of *Unibase* and *First Commodities* rest. The *Unibase* court recognized as much when it declined to engage in a traditional choice of law analysis, explaining that "it is only when the parties have failed to make a valid choice of law that courts apply traditional conflicts of laws rules." *Unibase,* at *3. In addition, the *Unibase* court was careful to limit its holding to the situation where "a tort or other claim is closely related to a contract *with an express choice of law clause.*" *Id.* at 5 (emphasis added). Accordingly, the court finds *Unibase* and *First Commodities* to be inapplicable to the present litigation, and will deny counterclaim defendants' motion to dismiss AT & T's counterclaims on the basis that they are closely related to the CGL Policies.

### 3. *Choice of Law: Applying Griffith to AT & T's Counterclaims*

■ Without a choice of law provision governing AT & T's counterclaims, the court must engage in a traditional choice of law analysis. Since this court's jurisdiction is based on diversity of citizenship, Pennsylvania's choice-of-law rules govern. *See Klaxon Company v. Stentor Electric Manufacturing Company,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941) (holding that in diversity cases, this court must use the choice-of-law rules that "conform to those prevailing in [Pennsylvania's] state courts").

The seminal choice-of-law case in Pennsylvania is *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964). *See Carrick v. Zurich–American Insurance Group,* 14 F.3d 907, 909 (3d Cir.1994). In *Griffith,* the Pennsylvania Supreme Court held that instead of applying the *lex loci delicti* rule to tort cases by rote, courts should utilize "a more flexible rule which permits analysis of the policies and interests underlying the particular issue before the court." *Griffith,* 203 A.2d at 805.

The *Griffith* test, which is also known as the "flexible conflicts methodology," "combines the approaches of both Restatement II (contacts establishing significant relationships) and 'interest analysis' (qualitative appraisal of the relevant States' policies with respect to the controversy)." *Carrick,* 14 F.3d at 909 (quoting *Lacey v. Cessna Aircraft Company,* 932 F.2d 170, 187 (3d Cir. 1991)). The flexible conflicts methodology enables the court's decision to be based on the quality, rather than the quantity, of the state's contacts. *Cipolla v. Shaposka,* 439 Pa. 563, 267 A.2d 854, 856 (1970). *See Myers v. Commercial Union Assurance Companies,* 506 Pa. 492, 485 A.2d 1113, 1115 (1984) (summarizing Pennsylvania's choice of law rules).

■ AT & T has alleged causes of action for breach of contract, statutory fraud, negligent provision of loss control services, conspiracy to misrepresent or conceal facts, and bad faith. In bringing these claims, AT & T stands in the shoes of its assignors, Diversified and Diversified's affiliates. Therefore, for purposes of this choice of law analysis, the court will look to the Diversified Companies' places of business and conduct.

■ AT & T contends that its counterclaims, except for the breach of contract claim, do not directly involve the CGL Policies at issue, but are aimed instead at the counterclaim defendants' tortious conduct. AT & T claims that since the CNA Companies are Illinois corporations, and since the alleged conduct occurred at their principal places of business in Illinois, Illinois has an interest in this litigation which mandates the application of Illinois law to AT & T's counterclaims. AT & T's argument is not totally without merit. There have been cases where courts appear to accord considerable weight

to the location of the insurance company's office and the place where the decision to withhold benefits was made. For instance, in holding that Pennsylvania law was to govern, the court in *Thomson v. Prudential Property & Casualty Insurance Company*, No. CIV.A. 91–4073, 1992 WL 38132 (E.D.Pa. Feb. 20, 1992), noted that Pennsylvania was "the place where the alleged wrongful conduct in adjusting the claims submitted by the plaintiff occurred." *Thomson*, 1992 WL 38132, at *4. Similarly, the court in *Lowe's North Wilkesboro Hardware, Inc. v. Fidelity Mutual Life Insurance Company*, 319 F.2d 469, 474 (4th Cir.1963), held that Pennsylvania law was to govern the litigation, explaining that the insurance application was sent to the insurer's home office in Pennsylvania, and only there could the application be acted upon and rejected.

There is no doubt that Illinois has some interest in this litigation given that the counterclaim defendants are Illinois corporations. In addition, Illinois certainly has an interest in monitoring the behavior of insurance companies within its borders. Indeed, it seems likely that the Consumer Fraud Act was enacted in part to deter insurance companies from taking advantage of insureds. *See Fox v. Industrial Casualty Insurance Company*, 98 Ill.App.3d 543, 54 Ill.Dec. 89, 92, 424 N.E.2d 839, 842 (1981) ("the sale of insurance is clearly a service and insureds are thus consumers within the protections of the Consumer Fraud Act"); *P.I.A. Michigan City, Inc. v. National Porges Radiator Corporation*, 789 F.Supp. 1421, 1426 (N.D.Ill.1992) ("the sale of insurance is a service to which the protections of the Consumer Fraud Act apply"). However, despite Illinois' interest in this litigation, the court concludes that Pennsylvania law governs AT & T's counterclaims.

At the heart of this litigation is a dispute between insurers and insureds about the extent of coverage under an insurance policy. The CGL policies at issue covered a Pennsylvania site, and were issued to companies doing business in Pennsylvania. During the relevant time periods, the insurers were licensed to sell insurance in Pennsylvania, and were subject to all applicable Pennsylvania laws and regulations. *See, e.g.*, 40 P.S. § 1 *et seq.* ("The Insurance Department Act of 1921"); 40 P.S. § 1171 *et seq.* ("The Unfair Insurance Practices Act"). By enacting such regulations, Pennsylvania has demonstrated an interest in protecting businesses operating within its borders from the type of tortious conduct alleged by AT & T. *See Melville v. American Home Assurance Company*, 584 F.2d 1306, 1313–1314 (3d Cir.1978) ("[a] state has a significant interest in prescribing the standards that will govern insurance contracts purchased by its residents ...").

In *Asplundh Tree Expert Company v. Pacific Employers Insurance Company*, No. CIV.A. 90–6976, 1991 WL 147461 (E.D.Pa. July 25, 1991), Judge Reed was confronted with a situation similar to the one at bar. An insured filed claims against its insurer for breach of contract and bad faith. It was undisputed that Pennsylvania law governed the breach of contract claim. However, the insured contended that California law governed the bad faith claim. The insured argued that California law applied because the insurer was a California corporation, California was "where the denial of coverage occurred," and the "bad faith motives for the denial took place in California." *Id.* at *6.

The court disagreed, and held that, under *Griffith*, Pennsylvania law applied to the bad faith claim. The court noted that "the same facts give rise to both the breach of contract and bad faith conduct." Instead of looking at the place where the denial of coverage occurred, the court looked to Pennsylvania— the place "where the failure to receive the allegedly expected benefits was felt." *Id.* at *7. In addition, the court noted that "[t]he Commonwealth of Pennsylvania certainly has a compelling interest in regulating the conduct of insurers operating in Pennsylvania ..." *Id.* See also *Celebre v. Windsor–Mount Joy Mutual Insurance Company*, No. CIV.A. 93–5212, 1994 WL 13840 (E.D.Pa. Jan. 14, 1994) (despite the fact that the allegedly tortious denial of insured's claim occurred in Pennsylvania, New Jersey law applied to insured's bad faith claim where the insured was doing business in New Jersey,

the insured risk was located in New Jersey, and the loss occurred in New Jersey).

The Restatement (Second) of Conflicts supports this court's conclusion that AT & T's counterclaims are governed by Pennsylvania law. Section 145 sets forth the general principles to be considered when engaging in a choice of law analysis for causes of action sounding in tort. The contacts to be evaluated for tort claims include the place of the injury, the place where the injury-causing conduct occurred, the places of incorporation and business of the parties, and the place where the relationship of the parties is centered. Restatement (Second) of Conflicts, § 145(2); *Griffith*, 203 A.2d at 802; *Compagnie des Bauxites de Guinee v. Argonaut–Midwest Insurance Company*, 880 F.2d 685, 689 (3d Cir.1989).

The substantial weight of the above considerations point to the application of Pennsylvania law to AT & T's counterclaims. For instance, it is clear that any injury to Diversified and its subsidiaries occurred in Pennsylvania, the place where the failure to receive the expected insurance proceeds was felt. This contact is significant. This is because "persons who cause injury in a state should not ordinarily escape liabilities imposed by the local law of that state...." Restatement (Second) of Conflicts § 145, comment e. Although AT & T claims that the place where the tortious conduct occurred is paramount,

Comment e to Section 145 explains that the place of the tortious conduct is usually significant only if the state where the injury occurred either cannot be determined or bears little relation to the parties. In the present case, the injury occurred in Pennsylvania, a state having a significant connection to the parties. As noted above, all parties to the CGL Policies were doing business in Pennsylvania at the relevant time periods. Furthermore, it is beyond dispute that the insured risk which was the subject of the transaction was an environmental site located in Pennsylvania.[15]

For the foregoing reasons, the court concludes that AT & T's counterclaims must arise out of Pennsylvania law. Pennsylvania has both a greater interest in the outcome of this litigation and more substantial contacts with AT & T's counterclaims than Illinois. It should be noted, however, that this conclusion does not leave AT & T without recourse. Pennsylvania recognizes claims for bad faith denial of coverage, misrepresentation, negligent provision of loss control services, and statutory fraud. *See* 42 Pa.C.S.A. § 8371; 73 P.S. § 201 *et seq.*; *Henry v. State Farm Insurance Company*, 788 F.Supp. 241 (E.D.Pa.1992). Accordingly, AT & T has twenty days from the date of this opinion and order to amend its counterclaims to allege causes of action under Pennsylvania law.

---

**15.** Section 148 of the Restatement (Second) of Conflicts provides the choice of law principles specifically applicable to AT & T's fraud and misrepresentation causes of action. Section 148(2) applies to situations, like the one at bar, where detrimental reliance by one party occurs in a state other than the state where the misrepresentations were allegedly made. In these situations, the contacts to be considered are: the location of the detrimental reliance; the place where the misrepresentations were received; the place where the misrepresentations were made; the places of business and incorporation of the parties; the place where the tangible thing that is the subject of the transaction between the parties was situated; and the place where performance under the contract is to be rendered. Restatement (Second) of Conflicts § 148(2)a–f.

The substantial weight of the above contacts support this court's conclusion that Pennsylvania law governs AT & T's misrepresentation counterclaims. Diversified and its subsidiaries presumably received the alleged misrepresentations in Pennsylvania. Comment g to Section 148 explains that the place where the misrepresentations were *received* "constitutes approximately as important a contact as does the place where the [counterclaim defendants] made the representations." *Id.* § 148, Comment g. Furthermore, the insured risk which was the subject of parties' transaction was the Site located in Pennsylvania. This contact is significant. As Comment i notes:

When the subject of the transaction between the parties is a tangible thing, the place where the thing is situated at the time of the transaction is a contact of some importance provided, at least, that both parties were aware that the thing was situated in this place at that time. The contact is of particular importance when the subject of the transaction is land.

*Id.* § 148, comment i. Finally, it appears that Diversified and its subsidiaries were expected to render performance on the CGL Policies, i.e. to make payments, from their Pennsylvania places of business. Accordingly, the court concludes that the great weight of the relevant contacts mandates that Pennsylvania law govern AT & T's misrepresentation counterclaim.

## C. Negligent Provision of Loss Control Services

In Count IV of its counterclaims, AT & T alleges that counterclaim defendants negligently failed to provide loss control services to Diversified and its subsidiaries.[16] Specifically, AT & T claims that counterclaim defendants represented that they had expertise in discovering environmental damage, and that despite Diversified's reliance upon these representations, counterclaim defendants failed to discover or inform Diversified of the potential environmental liability arising from EDM's metal reclamation activities.

Counterclaim defendants have moved this court to dismiss Count IV. Counterclaim defendants claim that language within the CGL Policies (the "Disclaimers") precludes AT & T's claims for negligent provision of loss control services. Typical of the Disclaimers is the following:

The [insurance] company shall be permitted but is not obligated to inspect the named insured's property and operations at anytime. Neither the company's right to make inspections nor the making thereof nor any report thereon shall constitute any undertaking on behalf of, or for this benefit of, the named insured or others, to determine or warrant that such property or operations are safe or healthful or are in compliance with any law, rule or regulation.

Counterclaim defendants conclude that because the Disclaimers allowed them to inspect at their option and for their benefit, no duty to reasonably inspect the Site could have arisen.[17]

AT & T counters that the Disclaimers do not preclude claims for negligent provision of loss control services. AT & T claims that, although counterclaim defendants did not have a contractual obligation to inspect the Site, counterclaim defendants' voluntary inspections gave rise to a duty to inspect in a reasonable manner. AT & T alleges that Diversified reasonably relied upon counterclaim defendants' inspections of the Site, and that therefore Count IV states a valid negligence claim. See generally "Breach of Assumed Duty to Inspect Property as Ground for Liability to Third Persons," 13 A.L.R. 5th 289 (1993). In making this argument, AT & T relies primarily upon Section 323 of the Restatement (Second) of Torts ("Section 323").[18] Section 323 provides:

This [detrimental reliance] claim arises when a plaintiff has changed his position in reasonable reliance on the defendant's provision of protective services, and is thereby injured when the defendant fails to perform those services competently. For instance a plaintiff might forego other protective services in reliance on the defendant's actions.

Turbe v. Government of Virgin Islands, 938 F.2d 427, 431 (3d Cir.1991). See, e.g., Indian Towing Company v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (Coast Guard's voluntary provision of lighthouse services justified plaintiff's reliance upon Coast Guard's further use of due care).

In the present case, AT & T has alleged that Diversified reasonably relied upon counterclaim defendants' loss control services to "identify and analyze potential and actual environmental problems". See Answer and Affirmative Defenses to Amended Complaint for Declaratory Judgment and Counterclaim ("Counterclaim"), ¶ 146. Such an allegation is insufficient to satisfy Section 323's causation requirement of detrimental reliance.

In Blalock v. Syracuse Stamping Company, 584 F.Supp. 454 (E.D.Pa.1984), the court held that an insured's implementation of its insurer's safety recommendations was insufficient to state a

---

16. Both parties have focused on Pennsylvania law in making their arguments with regard to the legal sufficiency of Counts IV through VI. Therefore, the court will reach the merits of counterclaim defendants' motions to dismiss these counts, instead of waiting until after AT & T has resubmitted its counterclaims.

17. Various problems are raised by counterclaim defendants reliance upon the Disclaimers contained with the CGL Policies. Counterclaim defendants have not established that effective Disclaimers were contained within each of the various CGL policies given to Diversified and its subsidiaries. As noted above, counterclaim defendants have called into question the very existence of the policies from the years of 1966 to 1974. However, because the court concludes that the Disclaimers are ineffective to waive a duty to provide loss control services which may have arisen due to the counterclaim defendants' conduct, the court need not address these issues at this time.

18. Courts construing Pennsylvania law recognizes claims under Section 323 based upon detrimental reliance. The Court of Appeals for the Third Circuit has described such a claim as follows:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323. *See Morena v. South Hills Health System*, 501 Pa. 634, 462 A.2d 680, 684 (1983) (recognizing Section 323 as an accurate statement of the law of negligence in Pennsylvania). Section 323 has been applied by Pennsylvania courts, and federal courts applying Pennsylvania law, in the context of negligent inspections. *Blessing v. United States*, 447 F.Supp. 1160, 1187 (E.D.Pa.1978) (citing *Evans v. Liberty Mutual Insurance Company*, 398 F.2d 665 (3d Cir.1968)); *Mays v. Liberty Mutual Insurance Company*, 323 F.2d 174 (3d Cir. 1963); *Evans v. Otis Elevator Company*, 403 Pa. 13, 168 A.2d 573 (1961).

Section 323 does not create a duty where one otherwise would not exist. *Morena*, 462 A.2d at 684. Therefore, AT & T's negligent provision of loss control counterclaim could only stand if counterclaim defendants were under a duty to provide loss control services at the Site. *Boyce v. U.S. Steel Corporation*, 446 Pa. 226, 285 A.2d 459, 461 (1971) ("no negligence claim can be based upon a state of

facts on which the law does not impose a duty upon the defendant in favor of the plaintiff"). If counterclaim defendants owed this duty to Diversified and its subsidiaries, then AT & T would be permitted to attempt to prove that counterclaim defendants did not exercise reasonable care in the performance of their duty. However, if AT & T has not alleged a duty on the part of counterclaim defendants to provide loss control services, then this court must dismiss Count IV. *See Evans v. Liberty Mutual Insurance Company*, 398 F.2d at 667 (affirming directed verdict in favor of insurer where plaintiff failed to establish insurer's duty to inspect).

 Insurers of property are not under a general duty to inspect their insureds' property. *See Atlantic Mutual Insurance Company v. Center Capital Corporation*, No. CIV.A. 91–4636, 1992 WL 38164, at *4 (E.D.Pa. Feb. 21, 1992) (no public policy supports the imposition of a general duty on insurers to investigate insureds). However, a duty to inspect may arise where the insurer has contracted to provide inspection services, *Otis Elevator*, 168 A.2d at 573, or as a result of the insurer's conduct.[19]

 In the present case, the Disclaimer provides the CNA Companies with the right to inspect the Site at their option and states that any inspection should not constitute an "undertaking on behalf of, or for the benefit of, the named insured or others." This language is insufficient to create a duty to inspect. As courts have noted, an insurance

cause of action for detrimental reliance. Instead, the court held that in order to show detrimental reliance, the plaintiff had to present "evidence to demonstrate that [the insured] abandoned ... other precautions in reliance on [the insurer's] actions." *Id.* at 458.

AT & T's allegations are insufficient to state a cause of action for detrimental reliance. However, because neither of the parties have addressed detrimental reliance under Section 323, the court will not dismiss Count IV at this time. Instead, the court will allow counterclaim plaintiffs to augment the record to establish causation under Section 323. Of course, counterclaim defendants are free to file a motion for summary judgment at a later stage of this litigation if such a showing cannot be made.

**19.** Pennsylvania courts have held that a duty to provide loss control services does not arise merely from an insurer's advertisement. For instance, in *De Jesus v. Liberty Mutual Insurance*

*Company*, 423 Pa. 198, 223 A.2d 849 (1966), the Pennsylvania Supreme Court held that an insurer's duty to provide loss control services did not arise despite advertising representing that the insurer provided loss control services and safety counsel to its policyholders. The court explained:

None of the allegations of the complaint creates a duty in [the insurer] toward appellant because there is no averment that the advertisements were part of any contract or other legal obligation undertaken by [the insurer] of that they adversely affected appellant.

*Id.* at 850. Accordingly, because AT & T has failed to allege that counterclaim defendants' advertisements were part of a contract, AT & T cannot argue that their reliance upon counterclaim defendants' advertisements established a duty to inspect.

company can not be found "liable for its mere failure to take advantage of a clause in the insurance contract affording it permission to inspect." *Clark v. Employers Mutuals of Wausau*, 297 F.Supp. 286, 289 (E.D.Pa.1969) (citing *De Jesus v. Liberty Mutual Insurance Company*, 423 Pa. 198, 223 A.2d 849, 850 (1966)). In addition, various courts have held that a contractual duty to provide inspection services was lacking in light of language similar to the Disclaimers. *See, e.g., Henry v. First Federal Savings & Loan Association*, 313 Pa.Super. 128, 459 A.2d 772 (1983); *Blalock v. Syracuse Stamping Company, Inc.*, 584 F.Supp. 454 (E.D.Pa.1984).

■ In addition to contract, a duty to inspect in a reasonable manner may arise where an insurer has voluntarily assumed such a duty through its conduct. In *Blessing*, Judge Becker discussed the type of conduct which could create a duty to inspect. The court was confronted with the question of whether Occupational Safety and Health Administration inspectors could be found liable for negligently inspecting a private employer's premises where such negligence resulted in an injury to one of the employer's employees.[20] The court noted that even when an inspector is not under an otherwise

enforceable or contractual duty to inspect, a duty of reasonable inspection could arise when the "inspector has physically undertaken to inspect (1) the specific instrumentality causing the injury; or (2) the entire physical plant of which the specific instrumentality is a part." *Blessing*, 447 F.Supp. at 1189. *Cf. Evans v. Liberty Mutual*, 398 F.2d at 667 (where insurer was under no contractual obligation to inspect, no duty to inspect arose from its "spot" inspections). Because AT & T has alleged that counterclaim defendants actually inspected the Site, the narrow question before the court is whether the Disclaimer negates such a duty.[21]

There appears to be a split of authority among courts construing Pennsylvania law as to whether language similar to the Disclaimer will negate a voluntarily assumed duty to inspect. For instance, in *Henry*, a borrower sued his lender, alleging negligent inspection of the borrower's house. The lender defended on the grounds that no duty to inspect had arisen. The court agreed, noting that the loan agreement between the parties gave the lender the right to inspect "for its own protection" and not as an agent of the borrower. *Henry*, 459 A.2d at 775. The court did not discuss whether an inspection had

---

**20.** Because *Blessing* addressed the inspector's duty to third persons, it is actually a case arising under Section 324A of the Restatement (Second) of Torts. However, for purposes of deciding whether a duty to inspect has arisen, the analysis also applies to Section 323.

**21.** In its counterclaim, AT & T alleges in pertinent part:

> The CNA Companies ... (b) negligently inspected or *failed altogether to inspect* Diversified Companies' facilities

*See* Counterclaim, ¶ 147 (emphasis added).

Under Pennsylvania law, it is established that "essential to a finding of liability [under Section 323] is a particular undertaking in fact, not merely the expectation of one or the legal right to pursue one." *Blessing*, 447 F.Supp. at 1189. Therefore, in the absence of a contractual duty to provide loss control services, a duty to inspect in a reasonable manner would arise only if inspections were actually undertaken. As Judge Becker wrote:

> After *Evans v. Liberty Mutual*, it appears that when an inspector is not under an otherwise legal or contractual duty to inspect an employer's premises or equipment, an employee can recover for a negligently performed inspection

only where the inspector has physically undertaken to inspect (1) the specific instrumentality causing the injury, or (2) the entire physical plant of which the specific instrumentality is a part. *This simply follows basic tort law under the good Samaritan rule; duty is measured by undertaking.*

*Id.* (emphasis added). *See also Patentas v. United States*, 687 F.2d 707, 716 (3d Cir.1982) ("The foundation of the good samaritan rule is that the defendant specifically has undertaken to perform the task that he or she is charged with having performed negligently"); *Friedman v. F.E. Myers Company*, 706 F.Supp. 376, 383 (E.D.Pa.1989) (Section 323's foundation is the "undertaking of a specific task that the defendant is charged with having performed negligently"). Therefore, contrary to AT & T's allegations, counterclaim defendants could not be liable for negligently providing loss control services by merely failing to inspect the Site. Because counterclaim defendants were not under a contractual obligation to inspect, they could be liable only for negligent conduct during inspections actually performed. Accordingly, counterclaim defendants' motion to dismiss will be granted insofar as AT & T's claim for negligent provision of loss control services rests upon counterclaim defendants' nonfeasance, as opposed to misfeasance.

actually been undertaken by the lender, and instead concluded that the contractual language was dispositive of the issue.

The analysis in *Henry* contradicts both *Blessing* and *Evans v. Liberty Mutual.* In a footnote, the *Henry* court explained that a duty to inspect could only arise if the lender "contractually undertook to make quality inspections" for the borrowers' benefit. *Henry,* 459 A.2d at 775, n. 3. However, as discussed above, such a duty can also arise through an inspector's voluntary inspection of the either the specific instrumentality which later causes the injury or the insured's entire physical plant. *Blessing,* 447 F.Supp. at 1189. Therefore, because it is beyond dispute that a duty to inspect can arise through an insurer's gratuitous inspection, and because the *Henry* court's focus on the language of the contract overlooks the justified reliance of insureds, the court will decline to follow *Henry.*

In *Blalock,* an employee sued his employer's insurance carrier, alleging that the insurer failed to properly perform safety inspections. The insurer defended on the grounds that language in its contract with the employer negated any duty to inspect which might have otherwise arisen.

■ After concluding that a contractual duty to inspect was effectively negated by the contractual language, the court nevertheless noted that it was obliged to "examine one additional factor"—the conduct of the insurer. *Blalock,* 584 F.Supp. at 457. Based on its examination, the court assumed that such a duty had been alleged by the employee: *Id.* at 458 (citing *Blessing,* 447 F.Supp. at 1189). *See also Clark,* 297 F.Supp. at 289 ("even though it may have no contractual obligation to inspect, an insurer which actually undertakes a safety inspection . . . may be found liable"). Therefore, in light of *Blalock,* the court concludes that, under Pennsylvania law, a contractual waiver is ineffective to negate a duty to inspect which has arisen through an insurer's conduct.

Although Pennsylvania state courts have been relatively quiet on whether contractual language can effectively negate a duty to inspect which has arisen through conduct, this court's conclusion is in accord with those courts which have examined this issue. For instance, in *Derosia v. Liberty Mutual Insurance Company,* 155 Vt. 178, 583 A.2d 881 (1990), the insurer claimed that it had no duty to inspect because language in the insurance contract provided that any inspections were for the insurer's benefit and were to be performed at the insurer's option. The court agreed that the contract "standing alone" did not subject the insurer to liability. Nevertheless, the court concluded that a duty to inspect could have arisen through conduct. Quoting *Thompson v. Bohlken,* 312 N.W.2d 501, 507 (Iowa 1981), the court stated:

> [Defendant insurer] also argues that it cannot be held under a duty of inspection under its insurance contract with [employer]. However, its liability for its inspections does not arise from, *nor is it circumscribed by,* the contract of insurance; it arises . . . from its undertaking the responsibility of making such inspections in such a manner as to increase the risk of harm or create reliance to another's detriment. *Derosia,* 583 A.2d at 885 (emphasis added). *Accord. Hartford Steam Boiler Inspection & Insurance Company v. Pabst Brewing Company,* 201 F. 617, 629 (7th Cir.1912); *Corson v. Liberty Mutual Insurance Company,* 110 N.H. 210, 265 A.2d 315, 318 (1970); *American Mutual Liability Insurance Company v. St. Paul Fire & Marine Insurance Company,* 48 Wis.2d 305, 179 N.W.2d 864, 868 (1970).

■ AT & T has alleged that the CNA Companies gratuitously inspected the Site, and did so in a negligent manner. The Disclaimer is ineffective to negate a duty to inspect in a reasonable manner. Accordingly, the court will deny counterclaim defendants' motion to dismiss Count IV.

### D. *Conspiracy to Misrepresent or Conceal Facts*

In Count V of its counterclaims, AT & T alleges that counterclaim defendants conspired with various members of the insurance industry to deceive state regulators, the public, and, specifically, the counterclaim defendants. AT & T alleges that in 1970 vari-

ous insurance companies restricted their coverage for pollution-related claims despite the fact that they were informing government regulators, and insureds, that coverage was not being altered. Counterclaim defendants have moved to dismiss Count V.

AT & T's Count V relies heavily upon the history of the ratification of the "pollution-exclusion" clauses contained within many standard CGL Policies. Therefore, the court will briefly discuss the background events that led the insurance industry to adopt the standard pollution-exclusion clause. The history of the adoption of the pollution exclusion clause is largely uncontroverted and thoroughly documented elsewhere. *See, e.g.,* Richard Hunter, "The Pollution Exclusion in the Comprehensive General Liability Insurance Policy," 1986 U. of Ill.L.Rev. 897, 903–906; E. Joshua Rosenkranz, Note, "The Pollution Exclusion Through the Looking Glass," 74 Geo.L.J. 1237, 1241–53 (1986); *Morton International v. General Accident Insurance Company,* 134 N.J. 1, 629 A.2d 831, 849–855 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994); *Just v. Land Reclamation Ltd.,* 157 Wis.2d 507, 456 N.W.2d 570, 573–75 (1990). Therefore, the court will look beyond the four corners of AT & T's counterclaim when describing the drafting and adoption of the pollution-exclusion clause.

Prior to 1966, standard CGL Policies afforded liability coverage for bodily and property damage "caused by accident," the term "accident" being undefined. *See, e.g., Casper v. American Guarantee & Liability Insurance Company,* 408 Pa. 426, 184 A.2d 247 (1962). Although insurers argued that these policies covered only brief catastrophic events, courts generally construed these policies to cover ongoing events that inflicted injury over an extended period so long as the injury was both unintended and unexpected from the insured's viewpoint. *Morton,* 629 A.2d at 849. *See, e.g., Casper,* 184 A.2d at 249 ("to constitute an accident, the occurrence must be an unusual or unexpected result attending the operation or performance of a usual or necessary act or event"). Therefore, the pre-1966 policies covered injury or damage resulting from extended exposure to pollutants. *New Castle County v. Hartford Accident and Indemnity Company,* 933 F.2d 1162, 1196 (3d Cir.1991) (citing *Moffat v. Metropolitan Casualty Insurance Company,* 238 F.Supp. 165, 172–73 (M.D.Pa. 1964)).

In 1966, the insurance industry revised its standard CGL Policy to afford coverage based upon the happening of an "occurrence." An occurrence was defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Britamco Underwriters v. Grzeskiewicz,* 433 Pa.Super. 55, 639 A.2d 1208, 1210 (1994). The 1966 revision of the standard CGL Policy "was generally understood to cover pollution liability that arose from gradual losses, and was acknowledged as having been intended to broaden coverage by avoiding an implication that there was no coverage for a continuing condition as distinguished from a sudden event." *Morton,* 629 A.2d at 849 (citations omitted). As the Court of Appeals for the Third Circuit has noted, "the standard occurrence-based policy ... covered property damage resulting from gradual pollution." *New Castle County,* 933 F.2d at 1197.

In 1970, the insurance industry, foreseeing an increase in the number of environmental claims and cognizant of the interpretation being given to the 1966 CGL Policies, set out to draft the standard pollution-exclusion clause. The standard pollution-exclusion clause was drafted by committees of insurance representatives sponsored by the Insurance Service Office ("ISO"), and its predecessor organization, the Insurance Rating Board ("IRB"). The standard pollution-exclusion clause bars insurance coverage for:

> bodily injury or property damage arising out of the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic materials or other irritants, contaminants, or pollutants into or upon land, the atmosphere, or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

After gaining industry approval for the clause, the IRB and the Mutual Insurance Rating Bureau ("MIRB") sought state regulatory agencies' permission to add the pollution-exclusion clauses to standard CGL Policies. AT & T alleges that the IRB and MIRB, on behalf of the counterclaim defendants, filed the pollution-exclusion clauses with state regulatory agencies throughout the country.[22] In filing the clauses, the IRB and MIRB allegedly contended that the pollution-exclusion clauses merely clarified the "occurrence" based insurance policy, and did not restrict coverage in any manner. Because the pollution-exclusion clause has been interpreted as a limitation on insurance coverage,[23] however, AT & T contends that the insurance industry fraudulently misrepresented the meaning of the pollution-exclusion clause in 1970. Specifically, AT & T contends that counterclaim defendants engaged in a conspiracy with the entire insurance industry to defraud the public, and that as a result of these fraudulent misrepresentations counterclaim plaintiffs were injured. Counterclaim defendants have moved to dismiss on several grounds.

Counterclaim defendants claim that AT & T's cause of action is repugnant to Pennsylvania law. They contend that any evidence of the drafting or approval history of the clause must be disregarded because Pennsylvania courts construe the pollution-exclusion clause to be unambiguous. In making this argument, counterclaim defendants rely heavily upon *Lower Paxon*. There, the court stated:

> Amicus seek to convince us that the [insured's] coverage-promoting interpretation of the exclusion is correct because it was insurers' own interpretation at the time they drafted it and was the interpretation relied upon by insurance regulators in approving it. We express no comment on these arguments. Having found the exclusion unambiguous on its face, we are bound to construe it in accordance with its plain meaning and may not refer to extrinsic evidence of the drafter's intent.

*Lower Paxon*, 557 A.2d at 402 n. 5.

*Lower Paxon* involved a breach of contract claim, and therefore the court applied the traditional plain-meaning and parol evidence contract rules when it construed the pollution-exclusion clause. However, because the court finds *Lower Paxon* to be distinguishable, the court disagrees with counterclaim defendants that AT & T's misrepresentation claim is repugnant to Pennsylvania law.

---

**22.** Counterclaim defendants contend that they were not members of the IRB with respect to the filing of the pollution-exclusion clause with government regulators. Such a factual dispute is not a proper basis upon which a motion to dismiss can rest. In addition, the court notes that the Court of Appeals has previously found counterclaim defendants to be members of the ISO. *See New Castle County,* 933 F.2d at 1162.

**23.** The pollution-exclusion clause has been interpreted by Pennsylvania courts to provide that "damages resulting from a pollution discharge are covered only if the discharge itself is both sudden, meaning abrupt and lasting only a short time, and accidental, meaning unexpected." *Lower Paxon Township v. United States Fidelity and Guaranty Company,* 383 Pa.Super. 558, 557 A.2d 393, 399 *appeal denied,* 523 Pa. 649, 567 A.2d 653 (1989). *Accord Northern Insurance Company v. Aardvark Associates,* 942 F.2d 189, 193 (3d Cir.1991); *Koppers Company v. Aetna Casualty and Surety Company,* 840 F.Supp. 390, 394 (W.D.Pa.1993); *United States Fidelity & Guaranty Company v. Korman Corporation,* 693 F.Supp. 253 (E.D.Pa.1988). Accordingly, the pollution-exclusion clause does not merely clarify the occurrence-based policies; it acts as an additional limitation upon the insurer's liability. As the Pennsylvania Superior Court has noted:

> We believe the "occurrence" definition results in a policy that provides coverage for continuous or repeated exposure to conditions causing damages in all cases except those involving pollution, where coverage is limited to those situations where the discharge was "sudden and accidental."

*Lower Paxon,* 557 A.2d at 402. *See also New Castle County v. Hartford Accident & Indemnity Company,* 970 F.2d 1267, 1269 (3d Cir.1992) ("The occurrence clause provides coverage when the damage was unexpected and unintended, though caused by an intentional act, whereas the pollution exclusion clause excludes coverage except when the discharge was unexpected and unintended. So an insured can point to unexpected damage as a result of a deliberate act of discharge, and therefore have an occurrence, yet still be excluded from coverage because the discharge was expected and intended") (construing Delaware law), *cert. denied,* — U.S. ——, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993). *See generally* "Construction and Application of Pollution Exclusion Clause in Liability Insurance Policy," 39 A.L.R.4th 1047 (1985).

■ Pennsylvania's parol evidence rule provides that "in the absence of fraud, accident, or mistake, parol evidence as to preliminary negotiations or oral agreement is not admissible in evidence if it adds to, modifies, contradicts, or conflicts with the written agreement between the parties." *Resolution Trust Corporation v. Urban Redevelopment Authority*, 536 Pa. 219, 638 A.2d 972, 975 (1994). Because Count V sounds in misrepresentation, not breach of contract, the parol evidence rule does not operate to preclude the admission of evidence involving the history and drafting of the pollution-exclusion.

In *Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Investments*, 951 F.2d 1399 (3d Cir.1991), the Court of Appeals held that Mellon could not maintain its breach of contract claim because the oral promise allegedly made by First Union was barred by the parol evidence rule. Turning to Mellon's fraudulent misrepresentation claim, however, the court stated:

> While a minority of jurisdictions have held that an action for fraudulent misrepresentation cannot be maintained when the promise itself falls within the parol evidence rule, the majority position is that the parol evidence rule does not apply in mis-

representation cases ... We assume for purposes of this opinion, without deciding, that the Pennsylvania Supreme Court would follow the majority rule.

*Id.* at 1408, n. 8. *See also Rempel v. Nationwide Life Insurance Company*, 471 Pa. 404, 370 A.2d 366 (1977) (noting the majority and minority views without adopting either); *Levin v. Garfinkle*, 492 F.Supp. 781, 807 (E.D.Pa.1980) (promises barred by parol evidence rule on contract claim may be considered as proof of tort of misrepresentation), *aff'd*, 667 F.2d 381 (3d Cir.1981); *Shulman v. Continental Bank*, 513 F.Supp. 979, 987 (E.D.Pa.1981) (parol evidence rule does not control actions sounding in fraud) (citing *Miller v. Bare*, 457 F.Supp. 1359, 1365 (W.D.Pa. 1978); *Sunseri v. RKO–Stanley Warner Theatres, Inc.*, 248 Pa.Super. 111, 374 A.2d 1342 (1977)). Accordingly, the court concludes that Pennsylvania's parol evidence rule does not operate to exclude evidence of the pollution-exclusion clause's drafting history.[24]

■ This court has not been provided with any precedent addressing the issue of whether a misrepresentation claim can proceed against an insurance company in this context.[25] The court is aware that it may be

---

**24.** Courts have accorded different treatment to parol evidence depending upon whether it is being used to establish the meaning of the pollution-exclusion clause or to make out a claim of equitable estoppel. In *Anderson v. Minnesota Insurance Guaranty Association*, 520 N.W.2d 155 (Minn.Ct.App.1994), the insurance company defended on the grounds that the pollution exclusion clause previously had been interpreted to be unambiguous, and that an earlier case, *Sylvester Brothers Development Company v. Great Century Insurance Company*, 480 N.W.2d 368 (Minn.Ct. App.1992), had excluded evidence of the pollution-exclusion clause's drafting history. The court responded:

> The court in *Sylvester Bros.* was not asked to, and did not, decide the equitable estoppel claim advanced in the present case. The court was faced with the task of determining the definition of "sudden" in the "sudden and accidental" exception to the pollution exclusion.... The appellants in *Sylvester Bros.* argued that the drafting history of the pollution exclusion clause established the meaning of the clause. This court rejected that argument, holding the clause was unambiguous and would be interpreted according to its plain language.
> The claim in the present case is that, despite the unambiguous language of the pollution ex-

clusion clause, respondents are estopped to enforce the policy as it is written because misrepresentations were made to obtain approval of the policy. Appellants do not seek to vary the language of the pollution exclusion; they seek to void the clause. The claim is an analog to the use of extrinsic evidence to show fraud in the inducement to enter into a contract. The district court erred in holding that ... *Sylvester Bros.* foreclosed this argument.

*Anderson.* at 159–160. *See also Morton International v. General Accident Insurance Company of America*, 134 N.J. 1, 629 A.2d 831 (1993). The court finds *Anderson* to be persuasive. Therefore, although *Lower Paxon*—like *Sylvester Bros.*—precludes the use of parol evidence to interpret the pollution-exclusion clause, the court will allow such evidence to enter the case as part of counterclaim plaintiffs' misrepresentation claim.

**25.** The most comparable cases are *Morton International*, 134 N.J. 1, 629 A.2d 831 (1993), and *Anderson*, 520 N.W.2d 155 (Minn.Ct.App.1994). There, the courts held that insurance companies are equitably estopped from contradicting their regulatory representations concerning the scope and intent of the pollution-exclusion clause. Because these cases involved estoppel claims, how-

the first to apply Pennsylvania's common law fraud principles to an insurance company based upon the history of the pollution-exclusion clause. However, in light of the seriousness of AT & T's allegations, and the easy application of traditional tort rules to AT & T's allegations, the court is loathe to conclude that Count V is repugnant to Pennsylvania law. Accordingly, the court will not dismiss Count V on the ground that it fails to state a valid claim under Pennsylvania law.

Counterclaim defendants also contend that AT & T has failed to allege the necessary elements for a misrepresentation cause of action. The elements of misrepresentation are: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 889 (1994). *See also Trans Penn Wax Corporation v. McCandless*, 50 F.3d 217 (3d Cir. Feb. 28, 1995). Each element must be proven by clear and convincing evidence. *Wittekamp v. Gulf & Western, Inc.*, 991 F.2d 1137, 1142 (3d Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 309, 126 L.Ed.2d 256 (1993).

Federal Rule of Civil Procedure 9(b) requires plaintiffs to plead fraudulent misrepresentation with particularity. *Federal Deposit Insurance Corporation v. Bathgate*, 27 F.3d 850, 876 (3d Cir.1994); *Great West Life Assurance Company v. Levithan*, 834 F.Supp. 858, 863 (E.D.Pa.1993). The primary purpose of Rule 9(b) is to provide the adverse party fair notice of the charges. *U.S. v. Kensington Hospital*, 760 F.Supp. 1120, 1125 (E.D.Pa.1991). Therefore, in determining the sufficiency of a claim for misrepresentation or fraud, the "most basic consideration is whether the necessary degree of detail was provided to give the adverse party

adequate notice, and the ability to prepare a responsive pleading." *Great West*, 834 F.Supp. at 863. *See also Republic Environmental Systems v. Reichhold Chemicals*, 154 F.R.D. 130, 132 (E.D.Pa.1994) ("If the defendant can prepare an adequate answer to the complaint, the requirements of Rule 9(b) have been met."); *Gurfein v. Sovereign Group*, 826 F.Supp. 890, 906 (E.D.Pa.1993) (Rule 9(b)'s particularity requirement "must be read in conjunction with the liberal pleading rule" of Federal Rule of Civil Procedure 8).

Counterclaim defendants contend that Count V must be dismissed because AT & T has failed to allege that the counterclaim defendants made any material misrepresentations with regard to the pollution-exclusion clause. However, AT & T has alleged that the CNA Companies fraudulently failed to inform insureds that the pollution-exclusion clause had the effect of restricting insurance coverage, despite the fact that they had knowledge of such effect. *See* Counterclaim, ¶¶ 155, 159. Such an allegation is sufficient. A failure to disclose a material fact "amounts to a misrepresentation where disclosure would correct a mistake as to a basic assumption and non-disclosure amounts to a failure to act in good-faith and in accordance with standards of fair dealing." *Derby & Company v. Seaview Petroleum Company*, 756 F.Supp. 868, 876 (E.D.Pa.1991) *See also Moser v. DeSetta*, 527 Pa. 157, 589 A.2d 679, 682 (1991) ("the concealment of a material fact can amount to a culpable misrepresentation no less than an intentional false statement"). In the present litigation, AT & T has properly pleaded a cause of action based upon the CNA Companies' alleged non-disclosure.[26]

In addition, AT & T also alleges that counterclaim defendants are part of an insurance industry-wide conspiracy to defraud. As such, for purposes of a motion to dismiss,

---

ever, they do not directly support AT & T's claim that a cause of action in misrepresentation is appropriate here.

**26.** In addition, AT & T has alleged that misrepresentations were made on behalf of counterclaim defendants. For instance, paragraph 153 of AT & T's counterclaims provides that "In 1970, on

behalf of the CNA Companies, among others, IRB and MIRB filed the limited pollution exclusion endorsement with insurance regulatory agencies throughout the country." *See* Counterclaims, ¶ 153. *See also* Counterclaims, ¶¶ 154–159.

the various allegations of misrepresentations aimed at co-conspirators can be imputed to counterclaim defendants. Therefore, by arguing that AT & T must allege that the counterclaim defendants made material misrepresentations, counterclaim defendants have "overlooked the fact that even if [they] did not personally utter a misrepresentation, [they] are nonetheless liable for the conduct of [their] co-conspirators. Each defendant may be held responsible for a co-conspirator's fraudulent statements or conduct that furthered the conspiracy." *Markarian v. Garoogian,* 771 F.Supp. 939, 941 (N.D.Ill. 1991). Of course, AT & T will have to prove that there was, in fact, such a conspiracy.[27] However, because at this stage the court must accept all allegations as true, Count V is sufficient. *Cf. In re Donald J. Trump Casino Securities Litigation,* 7 F.3d 357, 374 n. 19 (3d Cir.1993) (where complaint fails to allege fraud with particularity, court need not assume that plaintiffs' allegations are true), *cert. denied,* —— U.S. ——, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994).

In summary, Rule 9(b)'s particularity requirement is satisfied when "there is suffi-cient identification of the circumstances surrounding fraud so that the defendants can prepare an adequate answer to the allegations." *Constitution Bank v. DiMarco,* 155 B.R. 913, 918 (E.D.Pa.1993). Because Count V provides counterclaim defendants with this information, the court will deny the CNA Companies' Rule 9(b) motion to dismiss Count V.[28]

### E. Bad Faith

In Count VI of its Counterclaims, AT & T alleges that the CNA Companies' denial of coverage, and accompanying conduct, constitutes bad faith. Counterclaim defendants have moved to dismiss.

Counterclaim defendants claim that Count VI must be dismissed because there is no common law cause of action recognized in Pennsylvania for bad faith. They further argue that because AT & T failed to cite Pennsylvania's bad faith statute, 42 Pa.C.S. § 8371 ("Section 8371") in its Counterclaims, AT & T can not rely upon it. The court disagrees with both of these contentions.

---

**27.** Counterclaim defendants also have moved to dismiss Count V on the grounds that AT & T has failed to allege the necessary elements of a conspiracy. Under Pennsylvania law:

> A conspiracy to defraud on the part of two or more persons means a common purpose supported by a concerted action to defraud, that each has the intent to do it, and that it is common to each of them, and that each understands that the other has that purpose.

*Allstate Insurance Company v. A.M. Pugh Associates, Inc.,* 604 F.Supp. 85 (M.D.Pa.1984). AT & T has alleged that counterclaim defendants acted in accord with the entire insurance industry to defraud the public. For instance, AT & T's avers:

> In failing to inform the public and the insurance regulators that the limited pollution exclusion was intended to preclude coverage for gradual pollution, as the CNA Companies now allege, and by failing to inform the public, insurance regulators, their policyholders, and certain of their underwriters, claims-handlers, and loss control representatives of defects with the limited pollution exclusion, the CNA Companies have conspired with other insurance companies to misrepresent or omit material facts regarding the limited pollution exclusion.

Counterclaim, ¶ 159. AT & T has also alleged that the CNA Companies subscribed to the IRB, and therefore were entitled to use, and did in fact use, the pollution-exclusion clause in their CGL Policies. Such allegations are sufficient to state a cause of action for conspiracy to defraud.

**28.** Despite the fact that Count V passes muster under the liberal motion to dismiss standard, the court is nevertheless troubled by AT & T's allegations. Presumably, Count V sounds in conspiracy to defraud rather than fraud because AT & T would be unable to properly allege that the CNA Companies had knowledge of the pollution-exclusion clause's effect at the time of its adoption. In this way, AT & T can point to evidence demonstrating that other entities within the insurance industry may have known of the pollution-exclusion clause's effect, and merely allege that the CNA Companies acted in concert with such entities.

This court is not a regulatory agency. As such, it is ill-equipped to deal with AT & T's allegations of industry-wide wrongdoing. The court is loathe to have this litigation devolve into an examination of the behavior of many entities, not parties to this litigation, merely due to AT & T's allegation of conspiracy. Therefore, although AT & T has properly pleaded its claims, it will face the burdensome task of producing evidence of an actual agreement between the CNA Companies and other entities, all of whom must have had an intent to defraud at the time of the pollution-exclusion clause's adoption.

■ In *D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Company*, 494 Pa. 501, 431 A.2d 966 (1981), the Pennsylvania Supreme Court refused to recognize a common law cause of action for an insurance company's bad faith. The Pennsylvania Legislature responded to *D'Ambrosio* by enacting Section 8371. This statute has been interpreted to create an independent cause of action for an insurer's bad faith conduct. *Winterberg v. CNA Insurance Company*, 868 F.Supp. 713, 722 (E.D.Pa. 1994) (citing *Margolies v. State Farm Fire & Casualty Company*, 810 F.Supp. 637, 642 (E.D.Pa.1992); *March v. Paradise Mutual Insurance Company*, 435 Pa.Super. 597, 646 A.2d 1254, 1256–57 (1994)). The CNA Companies contend that AT & T cannot rely upon Section 8371 because AT & T has failed to allege any bad faith conduct on the part of the counterclaim defendants which occurred after Section 8371's effective date, July 1, 1990.

In *Colantuno v. Aetna Insurance Company*, 980 F.2d 908 (3d Cir.1992), the Court of Appeals held that Section 8371 applies to insurance contracts entered into before Section 8371's effective date. The court stated that "Section 8371 may be applied to any insurance contract regardless of date. The relevant inquiry ... is not the contract date, but rather when [the insurance company] is alleged to have committed the bad faith conduct." *Id.* at 910. *Accord Grove v. Aetna Casualty & Surety Company*, 855 F.Supp. 113, 115 (W.D.Pa.1993); *Gavaghan v. Replacement Rent–A–Car, Inc.*, 811 F.Supp. 1077, 1079 (E.D.Pa.1992).

In the present case, AT & T has alleged that the CNA Companies have refused, and continue to refuse, to provide insurance coverage for Diversified's liability arising out of the Site. *See Grove*, 855 F.Supp. at 115 (noting that the majority of courts have held that the bad faith conduct covered by Section 8371 is an insurer's bad faith denial of coverage). Many of AT & T's allegations concern conduct occurring after July 1, 1990. For instance, AT & T has alleged that from April 1989 through October 1991, Diversified made repeated written and oral requests to the CNA Companies for coverage to no avail (Counterclaim ¶ 66), and that on November 22, 1991, the CNA Companies formally denied coverage to Diversified and filed the instant lawsuit. (Counterclaim, ¶ 69). Because there is no question that these allegations concern post–July 1, 1990 conduct, they are sufficient to state a cause of action under Section 8371.

■ Finally, the CNA Companies argue that AT & T cannot rely upon Section 8371 because AT & T failed to cite Section 8371 in its Counterclaim. However, a plaintiff need not allege the exact statutory or constitutional basis for his or her claim. *McCalden v. California Library Association*, 955 F.2d 1214, 1223 (9th Cir.), *cert. denied*, 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 227 (1992). *See. also Mid America Title Company v. Kirk*, 991 F.2d 417, 421 (7th Cir.) ("the complaint need not identify a legal theory, and specifying an incorrect legal theory is not fatal"), *cert. denied*, —— U.S. ——, 114 S.Ct. 346, 126 L.Ed.2d 310 (1993); *Jones v. Philadelphia College of Osteopathic Medicine*, 813 F.Supp. 1125, 1131 (E.D.Pa.1993) ("a complaint need not spell out the theory of liability under which a plaintiff hopes to recover"). "[P]laintiffs are required to plead facts, not legal theories." *Hammie v. Social Security Administration*, 765 F.Supp. 1224, 1227 n. 4 (E.D.Pa.1991). *See Evans Products Company v. West American Insurance Company*, 736 F.2d 920, 923 (3d Cir.1984) (court may grant relief on a theory not pleaded). Because AT & T has adequately pleaded the factual basis for its statutory bad faith claim, its failure to cite Section 8371 is immaterial. *See Hicks v. Arthur*, 843 F.Supp. 949, 959 (E.D.Pa.1994) ("a pleading must be sufficient enough to enable the court to make out the potential viable legal theories upon which the complaint is based"). Accordingly, the court will deny the CNA Companies' motion to dismiss Count VI.

## IV. Diversified and Sall's Motions for Default Judgment

Diversified and Sall have moved this court to enter default judgment against counterclaim defendants. Diversified and Sall contend that the counterclaims filed by AT & T were actually filed on behalf of all three of

the counterclaim plaintiffs, and that counterclaim defendants have waived their rights to respond by failing to answer Diversified and Sall's claims. Although the court agrees with Diversified and Sall that counterclaim defendants should have answered the counterclaims, default judgment will not be entered.

It is unclear whether the counterclaims filed with this court were filed on behalf of AT & T alone, or on behalf of all three counterclaim plaintiffs. Counterclaim plaintiffs point out that the introductory "Nature of Action" portion of the counterclaim defines AT & T, Diversified, and Sall as "Counterclaimants." However, as noted by counterclaim defendants, only AT & T is defined in the "Parties" section of the counterclaim and the counterclaim was signed only on behalf of "attorneys for AT & T Nassau Metals Corporation."

Although the court would not normally sanction counterclaim defendants' failure to respond to such an unclear pleading, the counterclaim plaintiffs apparently cleared up any confusion surrounding the counterclaims. On December 2, 1994, counsel for counterclaim plaintiffs informed counterclaim defendants of their failure to respond, and explained that the counterclaims were brought on behalf of all three counterclaim plaintiffs. Despite this explanation, counterclaim defendants have failed to answer Diversified and Sall's counterclaims, move to dismiss Diversified or Sall's claims, or move for a clarification of the counterclaims. The court finds counterclaim defendants' failure to respond to Diversified and Sall to be unreasonable.

Counterclaim plaintiffs have moved this court to enter default judgment against counterclaim defendants, noting that it is within this court's discretion whether to enter such judgment. *See* Federal Rule of Civil Procedure 55(d); *Heinzeroth v. Golen,* No. CIV.A. 84–2407, 1990 WL 238354 (E.D.Pa. Dec. 28, 1990). In the alternative, counterclaim plaintiffs have asked this court to rule that counterclaim defendants have waived any affirmative defenses that they may have raised.

However, the court has not decided to adopt either of counterclaim plaintiffs' suggestions.

▮ In a case of this size and importance, the court is reluctant to enter a default judgment or exclude affirmative defenses. As the Court of Appeals has noted, there exists a strong "policy disfavoring default judgments and encouraging decisions on the merits," *Harad v. Aetna Casualty & Surety Company,* 839 F.2d 979, 982 (3d Cir.1988), and that in close cases doubts should be resolved in favor of "reaching the merits." *Zawadski De Bueno v. Bueno Castro,* 822 F.2d 416, 420 (3d Cir.1987). In light of the ambiguous drafting of the counterclaims, the court could not in good conscience enter a default judgment or rule that the counterclaim defendants have waived their rights to offer affirmative defenses. *Horner Equipment International, Inc. v. Seascape Pool Center, Inc.,* 884 F.2d 89, 93 (3d Cir.1989) (court's discretion to enter default judgment "should be sparingly used ..."). However, this does not mean that the court can overlook the counterclaim defendants failure to respond properly to the counterclaims after being told to do so.

As previously noted, this litigation has proceeded very slowly. The court has ruled on various motions, and has spent many hours getting this case on schedule for trial. Therefore, the court has a great interest in moving this litigation past the preliminary motions stage without expending further judicial resources or delaying trial. Accordingly, the court has tried to fashion a sanction which will keep this litigation moving forward. *See Gross v. Stereo Component Systems, Inc.,* 700 F.2d 120, 122 (3d Cir.1983) (when determining whether default judgment ought to be entered, district courts "should consider whether lesser sanctions would better serve the interests of justice").

▮ As a sanction for their deficiency, the court will order counterclaim defendants to answer counterclaim plaintiffs' new counterclaims within ten days of receiving them.[29]

---

**29.** The court has already instructed counterclaim plaintiffs to resubmit their counterclaims. Such submission is to occur within twenty days of the date of this opinion. In order to avoid further confusion, counterclaim plaintiffs are directed to

In addition, counterclaim defendants will be forbidden from filing any further motions to dismiss prior to answering the new counterclaims. This result serves the dual purposes of sanctioning the counterclaim defendants for their default and allowing this litigation to proceed to the discovery stage. Accordingly, counterclaim plaintiffs will be able to begin investigating their counterclaims without having to respond to further motions, and the flurry of legal memoranda being filed with this court should be slowed.[30]

## V. CNA Financial's Motion to Dismiss

CNA Financial has moved to dismiss, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), the counterclaims filed against it by counterclaim plaintiffs.[31] However, because the court is not persuaded by CNA Financial's arguments, CNA Financial's motion to dismiss will be denied.

■ CNA Financial contends that there is no legal entity by the name of "CNA Insurance Company," and that therefore CNA Insurance lacks the legal capacity to be sued. However, the court has been informed by counterclaim plaintiffs that litigation has been commenced under the name "CNA Insurance Companies," *CNA Insurance Companies v. Waters*, 926 F.2d 247 (3d Cir.1991), and legal memoranda have been filed on behalf of "CNA Insurance Companies." *See, e.g.*, Plaintiff's Second Trial Brief, *CNA Insurance v. Transamerica Insurance Company*, CIV.A. No. 78–2263 (E.D.Pa. filed July 12, 1983). In addition, policyholders pay insurance premiums to "CNA." Moreover, the court is aware that many products are advertised under the name "CNA Insurance." Accordingly, because the court is unable to decipher whether CNA Insurance Company lacks the capacity to be sued, it will deny CNA Financial's motion to dismiss all claims against CNA Insurance Company.

CNA Financial next argues that it is not subject to this court's in personam jurisdiction. Because CNA Financial engages in a substantial amount of business in Pennsylvania, however, the court is not persuaded.

■ Federal Rule of Civil Procedure 4(e) permits a federal district court to exercise personal jurisdiction over a non-resident to the extent permitted by the laws of the state where the court sits. Under Pennsylvania law, jurisdiction over non-residents may be exercised to the fullest extent allowed under the United States Constitution. 42 Pa.C.S.A. § 5322. Therefore, as every first-year law student learns, the issue facing the court is whether CNA Financial has "minimum contacts" with Pennsylvania such that this court's exercise of personal jurisdiction over it would not offend "traditional notions of fair play and substantial justice." *International Shoe Company v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). In order to satisfy the minimum contacts requirement, the court must be able to point to "some act by which the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus provoking the benefits and protection of the law." *Burger King Corporation v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985).

■ In the present case, the court cannot conclude as a matter of law that CNA Financial has not purposefully availed itself of the privilege of doing business in Pennsylvania. The court has been informed that CNA Financial advertises extensively in Pennsylvania. In addition, CNA Financial officers have testified under oath that CNA Financial is the owner of trademarks with national application. Moreover, CNA Financial has bank accounts within Pennsylvania where policyholders are directed to deposit their premium payments. Finally, the court notes

---

carefully spell out the parties on whose behalf the counterclaims are being filed.

**30.** Despite this sanction, counterclaim defendants will be protected from any legally insufficient causes of action asserted by counterclaim plaintiffs. Counterclaim defendants may file motions for summary judgment or judgment as a matter of law as may be appropriate.

**31.** CNA Financial, alone among the counterclaim defendants, has responded to Diversified and Sall in filing its motion to dismiss. While the court commends CNA Financial for its cautious approach, it is nevertheless unpersuaded as to its arguments with regard to dismissal.

that CNA Financial has been subject to suit in other Pennsylvania cases based upon its business operations within Pennsylvania. *See, e.g., Little v. MGIC Indemnity Corporation,* 836 F.2d 789 (3d Cir.1987).

The remainder of CNA Financial's arguments with regard to its motion to dismiss refute AT & T's allegations that CNA Financial was involved with the CGL Policies at issue. However, these arguments are more appropriate at the summary judgment stage than as the basis for a motion to dismiss. AT & T has presented this court with sufficient facts to support this court's exercise of in personam jurisdiction over CNA Financial. Accordingly, CNA Financial's motion to dismiss will be denied.[32]

An appropriate order follows

### ORDER

AND NOW, this 27th day of March, 1995, upon consideration of the various motions before this court, and the responses thereto, it is hereby ORDERED that:

1. Defendants' Motion for Reconsideration, filed on September 30, 1994, is DENIED;

2. Counterclaim defendants' Motion to Dismiss, filed on November 2, 1994, is GRANTED as to Count II and Count III of AT & T's Counterclaims. Counterclaim plaintiffs have 20 days from the date of this Order to file new counterclaims alleging causes of action under Pennsylvania law;

3. Counterclaim defendants' Motion to Dismiss, filed on November 2, 1994, is GRANTED insofar as Count IV of AT & T's Counterclaims relies upon counterclaim defendants' failure to inspect, and is DENIED as to the remainder of Count IV. Counterclaim defendants' Motion to Dismiss is DENIED as to Count V and Count VI of AT & T's Counterclaims;

4. Counterclaim defendants' Motion to Strike in Part, filed on November 2, 1994, is DENIED;

5. CNA Financial's Motion to Dismiss, filed on December 12, 1994, is DENIED;

6. CNA Financial's Motion to Substitute Verification, filed on December 13, 1994, is GRANTED;

7. Defendants' Motion for Entry of Default Judgment, filed on December 22, 1994, is DENIED;

8. Defendants' Motion to Compel Counterclaim Defendants to Answer the Counterclaims, filed on December 22, 1994, is GRANTED. Upon receipt of defendants' new Counterclaims, all counterclaim defendants will have 10 days to answer. Counterclaim defendants may not file additional motions to dismiss or motions for additional time before answering;

9. Defendants' Motion to Exclude Affirmative Defenses, filed on December 22, 1994, is DENIED;

10. Transportation Insurance Company's Motion for Leave to File a Reply Memorandum, filed on January 12, 1995, is DENIED AS MOOT.

**32.** CNA Financial and AT & T have vigorously debated whether CNA Financial's corporate veil should be pierced. However, because the court has found that it has jurisdiction over CNA Financial outright, it need not address whether it could have done so through veil-piercing.